### MUNDY et al. v. STEVENS.

(Circuit Court of Appeals, Third Circuit. January 23, 1894.)

### No. 15.

**1. PERFORMANCE OF CONTRACT— QUESTION FOR JURY.**
   A contract for the excavation of a harbor was sublet (February 2, 1892) under an agreement that the work would be performed "within the time fixed by said contract and the extensions thereof, granted or to be granted," and the further stipulation that the original contractor should have the right to proceed with the completion of the work if there should be a failure under the agreement to perform the contract so as to endanger a forfeiture. The time fixed by the contract for the performance of the work was extended from December 31, 1891, to June 30, 1892, and there-

after to July 31, 1892, and, finally, to December 31, 1892. Pending this final extension (August 16, 1892), the original contractor resumed possession of the work. *Held*, in an action on a bond given by the original contractor to secure payments under the agreement, that it could not be said, as matter of law, that the danger of forfeiture was so great as to justify resumption of the work by the original contractor.

2. ALTERATION OF CONTRACT—DISCHARGE OF SURETIES.

A contract for the excavation of a harbor having been sublet, it was agreed between the parties that the contractor should pay over all moneys received therefor from the government, and that the subcontractor should pay in return a stipulated sum in monthly installments for each yard excavated during the month, with the proviso that, if at this rate any installment fell below $9,000, the deficiency should be deducted from the next payment received from the government. *Held*, where a bond had been given by the contractor, that a subsequent reduction in the amount of the installments to 2½ cents per yard, and the elimination of the provision in relation to minimum payments released a surety who had no knowledge of the change in the agreement.

3. ACTION AGAINST SURETIES—PLEADING AND PROOF.

In an action against sureties on a bond given to secure performance of a contract, the defense of material alterations in the contract, operating to release the sureties, may be made (Pa. Proc. Act, May 25, 1887) under the plea of the general issue, and without previous notice.

4. SAME—BURDEN OF PROOF.

A surety who defends on the ground of an alteration in the contract operating to release him has not the burden of showing that such alteration was without his consent, when the plaintiff himself sets out the alteration in his statement of claim, and introduces it in evidence.

5. DISCHARGE OF SURETY—ALTERATION OF CONTRACT.

A surety who, as attorney in fact for one of the principals, executes a supplementary contract altering the original to his own prejudice as surety, will be presumed to consent to the alteration, and is therefore not discharged.

6. SAME.

When an alteration of a contract to the prejudice of the sureties is assented to by one of them, but not by the other, the one remains bound, but the other is discharged.

7. SAME—PRACTICE ON APPEAL.

In an action on a bond, one of the sureties claimed a release by reason of an alteration, and presented the question of praying an instruction in his favor. The court reserved the question, and a verdict was returned against all the defendants. The surety then moved for judgment in his favor, non obstante, but the motion was dismissed, and judgment entered against the defendants generally. On writ of error, the appellate court decided in the surety's favor. *Held*, that the proper practice was to reverse the judgment, with directions to allow plaintiff to enter a nolle prosequi against the surety, and then to enter judgment on the verdict against the other defendants.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

This was an action upon a bond given to secure the performance of a contract, and was brought by C. Amory Stevens against James A. Mundy, Joseph Busch, and William B. Johns, doing business as James A. Mundy & Co., as principals, and John M. Sharp and Clarence Busch as sureties. There was a verdict and judgment for plaintiff against all the defendants, and they bring the case here on error.

The material facts were as follows: James A. Mundy & Co. had contracted with the United States to furnish the necessary plant and do the

work required for the improvement of the harbor of Philadelphia, and they were bound to remove 1,075,000 cubic yards of earth by December 31, 1891. At that date they had made but little progress, and they then secured an extension of time until June 30, 1892. In February, 1892, they sublet the work to plaintiff under the following contract:

"Agreement, made this second day of February, 1892, between C. Amory Stevens, party of the first part, and James A. Mundy & Company, consisting of James A. Mundy, Joseph Busch, and William B. Johns, parties of the second part.

"(1) The party of the first part agrees to furnish the necessary plant and do all the work required for the improvement of the harbor between Philadelphia and Camden, as described in the contract between the parties of the second part and Major C. W. Raymond, U. S. army, under date of April 23, 1891.

"(2) The party of the first part agrees to assume all the duties and obligations imposed by said contract upon the firm of James A. Mundy & Company, and to keep and perform all the undertakings, agreements, and covenants which said firm undertook to keep and perform under said contract.

"(3) The party of the first part further agrees to perform the work mentioned in said contract, and the modifications thereof made or to be made, in the manner and within the time fixed by said contract and the extensions thereof, granted or to be granted, and to save said firm of James A. Mundy & Company, and each of them, harmless from all loss or damage which might ensue to them by reason of any failure faithfully to perform said contract, resulting from the wrongful act or omission of said party of the first part or his representatives.

"(4) The parties of the second part agree to pay to the party of the first part for all work done by him hereunder, and as soon as the same is received from the war department by said parties of the second part, the same amount and prices for the work that the parties of the second part shall receive under their above-mentioned contract with the war department, to wit: First. Ten and seven-eighths (10⅞) cents per cubic yard, measured in the scows, for all material excavated, removed, and deposited at the place provided by the said James A. Mundy & Company, and approved by the engineer officer in charge for the entire improvement of the Philadelphia harbor approved by congress. Second. One dollar and ninety cents ($1.90) per lineal foot for piles and timber roofing or revetment removed. Third. Nine and a half (9½) cents per cubic yard, measured upon the scows, for all dredged material deposited and spread upon League island, this price to be in addition to the price per cubic yard paid under item one.

"(5) The parties of the second part will properly forward all applications for payments as soon as the same may be received from the party of the first part, and will make such reasonable requests and applications concerning the terms of said contract or modifications thereof as the party of the first part may suggest.

"(6) The party of the first part, in consideration of the premises, hereby agrees to pay to the parties of the second part the sum of one hundred and seventy nine thousand dollars ($179,000) as follows: The parties of the second part shall be paid monthly, until the payment of all money becoming due to them under the provisions of this section, the sum of three cents per yard for all material dredged during the month, and if subsequent to June 30, 1892, any such monthly payment shall not amount to at least nine thousand dollars ($9,000), the parties of the second part may deduct from the next payment falling due the party of the first part thereafter, under the provisions of the fourth section hereof, such sum as shall bring the payment for such preceding month up to the said sum of $9,000. The unpaid part of such $9,000 shall draw interest at six (6) per cent. from the date on which it should have been paid until paid or deducted as aforesaid; but no action shall be brought by the parties of the second part against the party of the first part for any such deficit below $9,000 in a monthly payment, unless said party of the first part shall fail to perform the work under this contract, and the parties of the second part shall be thereby compelled to complete the work. Said sum of $179,000 shall be paid within eighteen (18) months from this date; $150,000 thereof shall, if practicable, be paid within one year from

this date, and, in case any part of said sum of $150,000 shall then remain unpaid, such part shall draw interest at six (6) per cent. from that date till payment.

"(7) Upon the completion of the work under the said contract with the war department, or whenever the war department shall make payment of its reservation, the said parties of the second part shall retain (and from the first portion of the reservation so paid) such amount of the reservation made by the war department under said contract as shall, at the date hereof, be due to the said parties of the second part for work already performed; but the said parties of the second part shall pay over to the said party of the first part all such portion of said reservation as shall be hereafter retained by the war department under its contract for work thereunder undertaken, and completed by the said party of the first part on and after the date of this contract.

"(8) The parties of the second part may receive from the government and retain the amount due for work done by them prior to the date of this agreement.

"(9) In case the party of the first part shall fail to perform this contract, so as to endanger the forfeiture of the contract with the war department, the parties of the second part shall have the right to proceed to the completion of the work in order to keep good their above-mentioned contract with the war department."

After the execution of this contract and the making of the bond sued on, the following supplemental contract was made:

"It is hereby mutually agreed by and between C. Amory Stevens, of the first part, and James A. Mundy, Joseph Busch, and William B. Johns, copartners trading under the name of James A. Mundy & Co., parties of the second part, as follows: The sixth section or paragraph of the agreement for the performance of the work of dredging Philadelphia harbor, made and entered into by and between the parties hereto, and dated the second day of February, 1892, is hereby wholly canceled and revoked, and the following is hereby substituted as and for the said sixth section or paragraph of said contract, and the whole thereof, to wit: '(6) The party of the first part, in consideration of the premises, hereby agrees to pay to the parties of the second part the sum of one hundred and seventy-nine thousand dollars ($179,000) as follows: The parties of the second part shall be paid monthly, until the payment of all money becoming due to them under the provisions of this section, the sum of two and one-half cents per cubic yard for all material dredged during the month.' All the other terms and provisions of said contract of February second shall remain in full force and virtue.

"Sealed with our seals and dated this —— day of June, 1892.

"Witness:

| | | |
|---|---|---|
| "N. H. Rand. | Jas. A. Mundy. | [L. S.] |
| "N. H. Rand. | Wm. B. Johns. | [L. S.] |
| "N. H. Rand. | Jos. Busch, | |
| | "Per C. M. Busch, Atty. | [L. S.] |
| "N. H. Rand. | C. Amory Stevens. | [L. S.]" |

The bond sued on was as follows:

"Know all men by these presents that we, James A. Mundy, Joseph Busch, and William B. Johns, composing the firm of James A. Mundy & Company, as principals, and John M. Sharp and Clarence M. Busch, as sureties, are held and firmly bound unto C. Amory Stevens in the penal sum of two hundred and fifty thousand dollars ($250,000), lawful money of the United States of America, to be paid to the said C. Amory Stevens, his executors, administrators, or assigns, for which payment well and truly to be made we bind ourselves, our heirs, executors, and administrators, firmly by these presents.

"Sealed with our seals. Dated the second day of February, one thousand eight hundred and ninety-two.

"The conditions of the above obligation are such that if the above-bounden James A. Mundy, Joseph Busch, and William B. Johns, composing the firm of James A. Mundy & Company, their heirs, executors, or administrators, shall well and truly pay or cause to be paid unto the above-named C. Amory Stevens, his executors, administrators, or assigns, immediately upon the receipt thereof by them from the department of war of the Unit-

ed States of America, all and every sum or sums of money paid the said firm of James A. Mundy & Company by the said department of war for work of any nature whatsoever performed or done by the said James A. Mundy & Company or the said C. Amory Stevens, under and by virtue of an agreement for the improvement of Philadelphia harbor, made by and between the said firm of James A. Mundy & Company and the department of war of the United States of America, and dated the 21st day of April, 1891, as provided in the agreement of even date herewith by and between the said James A. Mundy, Joseph Busch, and William B. Johns, composing the firm of James A. Mundy & Company, and the said C. Amory Stevens; and, further, if the above-bounden James A. Mundy, Joseph Busch, and William B. Johns, composing the firm of James A. Mundy & Company,—in the event that the said department of war of the United States of America, or the representatives of the government of the United States of America, shall, by reason or on account of the execution of the said agreement between the said James A. Mundy, Joseph Busch, and William B. Johns, composing the firm of James A. Mundy & Company, and C. Amory Stevens, of even date herewith, and the rights and privileges acquired by the said C. Amory Stevens thereunder, or by reason of any act, omission, or negligence on the part of the said James A. Mundy, Joseph Busch, and William B. Johns, or the said firm of James A. Mundy & Company, during the existence of said agreements, or either of them, declare the said agreement between the department of war of the United States of America and the said James A. Mundy & Company for the improvement of Philadelphia harbor, dated the 21st day of April, 1891, forfeited or annulled, or shall take any proceedings to forfeit or annul said contract,—shall, immediately upon such agreement being declared forfeited, or proceedings thereunder so taken by said department, well and truly pay or cause to be paid unto the said C. Amory Stevens, his executors, administrators, or assigns, the sum of one hundred and seventy-nine thousand dollars ($179,000), or so much thereof as shall then have been paid unto the said James A. Mundy, Joseph Busch, and William B. Johns, in the manner and as provided for in the said agreement between the said James A. Mundy, Joseph Busch, and William B. Johns, and the said C. Amory Stevens, of even date herewith: Then, and in the event of all the aforesaid conditions being fully carried out and complied with, the above obligation to be void; otherwise, to remain in full force and virtue.
        James A. Mundy.    [L. S.]
      "William B. Johns,
        "By John M. Sharp, Atty.  [L. S.]
      "Joseph Busch,
        "By C. M. Busch, Atty.   [L. S.]
      "John M. Sharp,       [L. S.]
      "C. M. Busch.        [L. S.]
"Sealed and delivered in the presence of
   "Edward Kent."

The plaintiff, Stevens, after entering upon the work under his contract, made but slow progress, and, on the expiration of the extended time, only about one-third of the required excavation had been made. Another extension, until July 31, 1892, was then procured, at the end of which time a final extension was granted by the government, until December 31, 1892. The evidence tended to show that, in the latter part of July, work was stopped by the plaintiff, but was begun again early in August, and that Mundy & Co. were then in default for payments. On August 16th they took possession of the plant, and put an end to their contract with plaintiff. The suit is brought to recover payments alleged to have become due at that time.

George L. Crawford, for plaintiffs in error.

John G. Johnson and Henry N. Paul, for defendant in error.

Before ACHESON, Circuit Judge, and GREEN, District Judge.

ACHESON, Circuit Judge. In treating this case, we will consider, first, the seventh assignment of error, which is based upon the following exception, namely:

. "Counsel for defendants except to so much of the charge as states that the verdict should be for the plaintiff unless the jury find that the defendants believed, on August 16, that the plaintiff would not finish the work by January 1."

This was the only exception to the charge, which was very full,—covering every branch of the case. The exception, it will be perceived, does not quote any part of the charge, but goes only to the supposed general effect thereof in the one particular mentioned. It rests upon the following clause of the agreement of February 2, 1892, between Stevens (party of the first part) and Mundy & Co. (parties of the second part):

"(9) In case the party of the first part shall fail to perform this contract, so as to endanger the forfeiture of the contract with the war department, the parties of the second part shall have the right to proceed to the completion of the work, in order to keep good their above-mentioned contract with the war department."

The defendants below (the plaintiffs in error) did not ask the court to give the jury any special instructions with reference to this provision of the contract or its bearing upon the pending controversy. So far as the record shows, they did not present their views upon that subject to the court otherwise than by the brief and vague exception above quoted. Here, as the case is presented in the printed argument, two points are made, namely:

"(1) The real question was, had Stevens, August 16, 1892, endangered the forfeiture of the contract, the judge's charge rather conceding this, and treating it as waived? (2) The evidence is conclusive, requiring the court to say, as matter of law, that Stevens had then so endangered forfeiture as to justify Mundy & Co. resuming the plant under the contract."

But we think it would have been plain error had the court so instructed the jury. The contract of February 2, 1892, whereby Stevens agreed to perform the work which Mundy & Co. had undertaken to do by their contract with the United States government, expressly provided that Stevens was to do the work "within the times fixed by said contract and the extensions thereof, granted or to be granted." It is, then, very clear that Stevens was entitled to the benefit of the extension of the time of performance until January 1, 1893, which the government had granted in the first week of August, 1892. Hence Mundy & Co. had no right to oust Stevens at the very beginning of the extended time without good reason shown. The case, therefore, was not one for peremptory instructions. Whether Mundy & Co. had justifiable cause for taking possession of the plant and work on August 16th was submitted to the jury for their determination, the question being presented to them in two aspects. First, however, the jury were instructed that if, prior to that date, there had been an absolute or substantial failure by Stevens to comply with his contract, he was not entitled to recover anything, and whether he had so failed was referred to the jury. Then the charge proceeded thus:

"The defendants further assert [and thus we approach the real subject of controversy between these parties, in the judgment of the court] that the plaintiff absolutely abandoned the work, voluntarily, in August; and that, even if he did not, he was then so far behind in its performance that he could not have completed it by the end of the year, when the government re-

quired it to be completed, or, at least, that they were justified by past and existing circumstances in believing that he would not so complete it within the time. Herein is embraced the substance of the defense."

Now it is to be observed that the defendants below took no specific exception to this portion of the charge as misstating the real subject-matter of controversy or unduly narrowing the issues.

The court next proceeded to submit to the jury the question whether Stevens, the plaintiff, had abandoned the work when the defendants Mundy & Co. took possession, with instructions that, if they so found, the plaintiff could not recover. Finally, the court submitted to the jury the question whether the plaintiff was so far behind in his work on August 16th that Mundy & Co. were justified in believing that he would not complete the work by the end of the year. Here the court said:

"The only serious source of danger to the contract at the time referred to was from failure to complete the work by the end of the year. The efforts of the engineer in charge were intended principally, as it would seem from past experience, to hasten the work. I repeat that the only real source of danger was involved in the question whether the plaintiff would complete the work within the period named. If you find from the evidence that Mundy & Co. were justified in believing, from all the circumstances, that the plaintiff would not complete it within the year, then they were justified in turning him out, and resuming the work themselves; otherwise, they were not."

And the jury were further instructed that all the circumstances existing at the time the plant was seized by the defendants, and all past experience respecting the work,—the plaintiff's prior failures and his conduct,—were to be taken into account in determining the question whether or not the defendants were justified in believing that the plaintiff would not finish the work by the last of the year, and that if they so believed, or were justified in so believing, they were justified in turning the plaintiff out, and he could not recover. We are not convinced that the defendants below had any right to complain of the manner in which the case was submitted to the jury. From our examination of the evidence, we do not discover that on August 16, 1892, there was any real danger of the forfeiture of Mundy & Co.'s contract with the government other than from the possible failure to complete the work within the extended time. By the extension in August, presumably, the government had waived past delinquencies. Moreover, the uncontradicted testimony is that the extension was unconditional,—not dependent upon an increase of the plant. Our conclusion, then, is that the seventh assignment of error is without substantial merit, and, accordingly, it is overruled.

All the other assignments of error relate to the liability of the sureties in the bond of February 2, 1892, and they will be considered together. The bond was conditioned for the payment to Stevens by Mundy & Co. of all moneys received by them for work done under the contract with the government, "as provided in the agreement of even date herewith" between Mundy & Co. and Stevens. Turning to that agreement, we find that, by the fourth paragraph thereof, Mundy & Co. (parties of the second part) bound themselves to pay to Stevens (party of the first part) the contract price for all work done

by him as the moneys therefor were received by them from the government. The sixth paragraph of this agreement bound Stevens to pay to Mundy & Co. the consideration or sum of $179,000, as follows:

"The parties of the second part shall be paid monthly, until the payment of all money becoming due to them under the provisions of this section, the sum of three cents per yard for all material dredged during the month, and if subsequent to June 30, 1892, any such monthly payment shall not amount to at least nine thousand dollars ($9,000), the parties of the second part may deduct from the next payment falling due the party of the first part thereafter, under the provisions of the fourth section hereof, such sum as shall bring the payment for such preceding month up to the said sum of $9,000. The unpaid part of such $9,000 shall draw interest at six (6) per cent. from the date on which it should have been paid until paid or deducted as aforesaid; but no action shall be brought by the parties of the second part against the party of the first part for any such deficit below $9,000 in a monthly payment, unless said party of the first part shall fail to perform the work under this contract, and the parties of the second part shall be thereby compelled to complete the work. Said sum of $179,000 shall be paid within eighteen (18) months from this date; $150,000 thereof shall, if practicable, be paid within one year from this date, and in case any part of said sum of $150,000 shall then remain unpaid, such unpaid part shall draw interest at six (6) per cent. from that date till payment."

In the month of June, 1892, Stevens and Mundy & Co. entered into a supplementary agreement, whereby the sixth paragraph of the agreement of February 2, 1892, was canceled and revoked, and the following section was substituted therefor:

"(6) The party of the first part, in consideration of the premises, hereby agrees to pay to the parties of the second part the sum of one hundred and seventy-nine thousand dollars ($179,000) as follows: The parties of the second part shall be paid monthly, until the payment of all money becoming due to them under the provision of this section, the sum of two and one-half cents per cubic yard for all material dredged during the month."

Was this change material to the sureties? We are constrained to hold that it was. True, the bond is not conditioned for the performance generally by Mundy & Co. of their stipulations. Yet the payments to Stevens, for which the bond is conditioned, were to be made "as provided in the agreement," and the fourth and sixth paragraphs thereof are so related to each other that, with reference to the obligation which the sureties assumed, they must be read together. Now, the latter paragraph secured to Mundy & Co., after the month of July, 1892, the right to a monthly deduction of not less than $9,000 from the payments to be made by them to Stevens under the fourth paragraph. The benefit of this provision undoubtedly inured to the sureties, and without their concurrence they could not be deprived of this right of defalcation. Navigation Co. v. Rolt, 6 C. B. (N. S.) 550; Calvert v. Dock Co., 2 Keen, 638, 639; Bragg v. Shain, 49 Cal. 131; Dundas v. Sterling, 4 Pa. St. 73. The June agreement, however, did not merely reduce the rate of payment to Mundy & Co., but altogether canceled the provision securing a minimum monthly deduction of $9,000 from the payments to Stevens. That the position of the sureties was thus altered to their prejudice seems to us an unavoidable conclusion. Indeed, it materially affected their liability with respect to the identical fund (the August payment by the government), which is the subject-matter of this suit.

These views are not inconsistent with our rulings in Harper v. Insurance Co., 5 C. C. A. 505, 56 Fed. 281. The agreement there did not appropriate the agent's commissions to the payment of his indebtedness, and the creditor was under no sort of obligation to compel the agent to make such application. The insurance company, at its pleasure, might have required the agent to account for and pay over his commissions in excess of a certain monthly sum, but it had not engaged to do so, and owed no duty in that regard to the surety. The new schedule of commissions was no departure from the contract with the surety, and in no wise altered his position.

The point made by the defendant in error that the sureties could not in the court below raise the defense based on the change of the contract without previous notice thereof is not sustainable. No rule of court requiring such notice has been brought to our attention, and by the Pennsylvania procedure act of May 25, 1887 (P. L. 271), the defense was permissible under the plea of the general issue, and, indeed, a special plea setting it up was not allowable. Nor can we assent to the proposition that the burden of proof was upon the sureties to show that the alteration of the agreement of February 2, 1892, was without their consent. The cases cited in support of this position are inapplicable, for the sureties here were not the actors. The plaintiff set forth the supplementary agreement of June, 1892, in his statement of claim,—made it part of his case, and introduced it in evidence. The burden of proof, therefore, was upon him. Whart. Ev. § 357. We are unable to find in this record any evidence tending to show that John M. Sharp assented to, or even had knowledge of, the alteration of the agreement. This defense, then, avails him. But as respects the other surety, Clarence M. Busch, the case is different. It appears that he signed the supplementary agreement of June, 1892,—acting, it is true, as attorney in fact of one of the principals,—thus, "Joseph Busch, per C. M. Busch, Attorney." That he had full knowledge of the alteration is indisputable. Is he in any position to say that the alteration was without his assent, and, hence, that he is equitably absolved from his liability as surety upon the bond in suit? There is no evidence that he personally objected to the change. This, indeed, is not pretended. He gave no sign of dissatisfaction. The case, however, is not one of simple acquiescence. Clarence M. Busch was not merely passive. He took an active part in making the change in the contract. Without his co-operation the paper of June, 1892, would have been ineffective. He gave it validity. Surely, then, complaint in his mouth is out of place. Can he, under all the circumstances, fairly claim the benefit of the principle that an alteration of a contract without the surety's concurrence discharges him? In Edwards v. Coleman, 6 T. B. Mon. 567, cited by the plaintiffs in error, the surety signed as a mere witness. Moreover, at the time he was told that he was discharged, and with that understanding he attested the instrument. This case is essentially different. Here the surety joined in bringing about the change of which he now seeks to take advantage. His defense is absolutely devoid of merit. In Woodcock v. Railway Co., 1 Drew. 521, it was held that sureties were not released by an alteration in the

terms of the contract, where, as the solicitors of the principal debtors, they had knowledge of the transactions upon which they relied for their discharge, and assisted in the preparation of the instruments for carrying into effect the arrangements of which they complained. The evidence of assent is much stronger here. The surety Busch had knowledge of the proposed change, and participated in effecting it, actually executing the instrument whereby it was consummated. These facts, in the absence of any counteractive circumstance, well warrant the implication of the surety's concurrence in the change. The inference is reasonable and just.

The situation, then, is this: One of the two sureties assented to the alteration of the contract; the other did not. In this state of affairs, the nonassenting surety is discharged, but the other remains bound as before. Wolf v. Fink, 1 Pa. St. 435; Crosby v. Wyatt, 10 N. H. 318. The assenting surety, in such case, in effect agrees that he will stand as surety for the whole liability, and that his cosurety shall be released. Id. Where one of the several defendants sued upon a joint contract sets up a defense personal to himself, the approved practice is to allow a nolle prosequi as to that particular defendant, and to proceed against the others by verdict or judgment after the verdict, as the case may be. Minor v. Bank, 1 Pet. 46; Kurtz v. Becker, 5 Cranch, C. C. 671, Fed. Cas. No. 7,951; Commonwealth v. Nesbitt, 2 Pa. St. 16; Freedly v. Mitchell, Id. 100; Woodward v. Newhall, 1 Pick. 500; Burke v. Noble, 48 Pa. St. 168. In the court below the question of the discharge of the defendant Sharp was raised by prayers for instructions for a verdict in his favor. The court reserved the question of law involved, and a verdict against all the defendants was rendered. After verdict, Sharp moved for judgment in his favor, non obstante veredicto, which motion was dismissed, and judgment on the verdict entered against the defendants generally. In this state of the record the proper course, it seems to us, to pursue is to reverse the judgment, and remand the cause for further proceedings in conformity with the views expressed in this opinion. Accordingly, the judgment is reversed, and the cause is remanded to the circuit court, with directions to allow the plaintiff to enter a nolle prosequi as to the defendant John M. Sharp, and thereupon to enter judgment on the verdict against the other defendants.

## Sur Motions to Amend the Reversing and Remanding Order.

PER CURIAM. 1. The motion made by the plaintiff in error to amend our remanding order is denied, for reasons appearing in the opinion of the court heretofore filed.

2. Without meaning to intimate a doubt as to the right of the court, in the exercise of a sound discretion, to enter the judgment which the defendant in error now moves for, we must deny the application, for we are not satisfied that it would be proper for us to enter such a judgment, under all the circumstances of the case. We therefore adhere to our order reversing the joint judgment and remanding the cause for further proceedings in conformity with our conclusions.