COOPER INVESTMENTS, Robert Rifkin, and Gerald Kernis, Plaintiffs–Appellees and Cross–Appellants,

v.

Robert L. CONGER, Thomas H. Stroh, and Jack W. Welsh, Defendants–Appellants and Cross–Appellees.

No. 86CA0010.

Colorado Court of Appeals, Div. I.

April 27, 1989.

Rehearing Denied May 25, 1989.

Dill, Dill & McAllister, Jon Stonbreaker, Lucien Dhooge, Denver, for plaintiffs-appellees and cross-appellants.

Eric J. Pringle, Edward E. Pringle, Denver, for defendants-appellants and cross-appellees.

HUME, Judge.

In this action to enforce a written guaranty agreement for payment of a promissory note, defendants, Robert L. Conger, Thomas H. Stroh, and Jack W. Welsh (guarantors), appeal the judgment in favor of plaintiffs, Cooper Investments, Robert Rifkin, and Gerald Kernis (creditors). Guarantors assert that the trial court erred in rejecting their affirmative defense of discharge by reason of a September 1982 modification in the terms of the note. They further assert that the court erred in finding that they had waived any rights which the Uniform Commercial Code might otherwise have granted them. We reverse and remand with directions.

On May 31, 1978, creditors sold to guarantors all of the outstanding shares of stock in a corporation which owned the

assets of a certain restaurant and bar. In exchange, creditors were given a promissory note in which the corporation promised to pay creditors the principal sum of $450,000 together with interest at the rate of 8% per annum. The note called for payment of principal and interest in 67 monthly installments.

As security for the note, creditors were granted a security interest in certain personal property used in the restaurant and bar. In addition, guarantors furnished creditors with a separate written guaranty, which provided that they jointly and severally guaranteed "the prompt payment of the note...." It further provided that: "[T]his shall be a continuing guarantee extended to any note given in extension or renewal of this note notwithstanding the original note may have been surrendered, provided the liability of the [guarantors] shall not be increased over the amount contained in the original note...."

In November 1979, the guarantors entered into a contract to sell the corporation to a third party. Prior to closing that contract, the guarantors renegotiated the obligation due on the existing note, and a "replacement note" in favor of the creditors was generated. That note reaffirmed the corporation's promise to pay the then unpaid principal balance of the existing note, $390,000, together with interest at the rate of 8% per annum. It also extended the required payments beyond the original 67–month period, and further provided that it was understood that the guarantors were not thereby released from their guaranty agreement. Thereafter, the guarantors sold the corporation to the third party and were no longer involved in operating the restaurant and bar or in the management of the corporation.

In October 1981, the corporation entered into a joint venture agreement with Iona, Inc., concerning the operation of the restaurant and bar. As a result, all of the past due payments on the note were brought current, and Iona assumed the corporation's duty to pay the remaining installments.

In September 1982, the president of Iona approached creditors about a change in the payment terms of the note. They reached an oral agreement to reduce the monthly payments of principal and interest from $8,000 to $5,000 per month for eight months and also to increase the rate of interest from 8% to 12% per annum. After May 1983, no further payments were made on the note. Iona later defaulted on the note and creditors brought suit against guarantors. The trial court rejected guarantors' affirmative defenses and entered judgment jointly and severally against them.

## I.

Guarantors contend that the trial court erred in rejecting their affirmative defense of total discharge by reason of the September 1982 modification in the terms of the note. They argue that the modification materially altered the obligation to their detriment and without their consent. We agree in part.

## A.

Guarantors first argue that the trial court erred in determining that the September 1982 alterations did not constitute a material alteration of the principal debtor's obligation under the note. We agree.

■ In general, when a creditor has chosen to alter materially the principal debtor's obligation to the guarantor's detriment, without the guarantor's consent, that alteration discharges the guarantor's liability. *C.I.I.S. Partners v. Miller*, 762 P.2d 700 (Colo.App.1988); *Jackson v. First National Bank*, 28 Colo.App. 415, 474 P.2d 640 (1970).

■ An alteration is material if it changes the nature of the principal debtor's obligation, "either by imposing some new obligation ... or by taking away some obligation already imposed." *See* A. Stearns, *Law of Suretyship* § 6.3 (1951). Accordingly, the rate of interest which the principal debtor is required to pay under a promissory note is a material term of that note. *See Citizens Bank v. Lair*, 687 S.W.2d 268

(Mo.App.1985); *First National Bank v. Abraham*, 97 N.M. 288, 639 P.2d 575 (1982).

Here, the undisputed evidence in the record establishes that, in September 1982, creditors and the president of Iona orally agreed to modify the terms of the note, by reducing the required monthly payments of principal and interest from $8,000 to $5,000, and by increasing the interest rate from 8% to 12% per annum. We conclude that as a matter of law the change in the rate of interest materially altered the principal debtor's obligation under the note, and since the change involved an increase in the rate, it was detrimental to the guarantors.

## B.

Guarantors next argue that they did not consent to these alterations. They urge that the alterations were not within the scope of the written guaranty agreement and that none of them otherwise consented to the alterations. In the alternative, they assert that if guarantor Conger consented, he had no authority to bind the other guarantors.

We agree that the alterations were not within the scope of the written guaranty. Here, however, the record contains some evidence which, if believed by the trial court, may support findings that at least some of the guarantors subsequently consented to the alteration. And, since the trial court made no specific findings as to whether any of the guarantors otherwise consented, or whether any guarantor who did so consent possessed authority to bind the other guarantors, we decline to make such findings on appeal and remand to the trial court for determination of these issues.

■ The consent of a guarantor to an alteration is binding whether it is expressed as part of the initial obligation or is given later, either before or subsequent to the alteration. *C.I.I.S. Partners v. Miller, supra*. Such consent need not be evidenced by a writing. *Lincoln v. Transamerica Investment Corp.*, 89 Wash.2d

571, 573 P.2d 1316 (1978); Restatement of Security § 128 comment c (1941).

In determining the scope of a guarantor's consent to future alterations, a guaranty agreement must be "strictly construed and reasonably interpreted according to the intention of the parties as disclosed by the surrounding circumstances." *Continental National Bank v. Dolan*, 39 Colo.App. 16, 564 P.2d 955 (1977). Further, "[t]he liability of the guarantor is not to be extended by implication beyond the express limits or terms of the instrument, or its plain intent. It has been said a guarantor is, like a surety, a favorite of the law." *Burkhardt v. Bank of America*, 127 Colo. 251, 256 P.2d 234 (1954).

■ The guaranty agreement here expressly provided that it shall extend to "any note given in extension or renewal" of the original note. However, such consent to future extensions and renewals was not unlimited. The guaranty specifically provided that the guarantors did not consent to future extensions or renewals that would increase their liability over the amount contained in the original note plus accrued and unpaid interest. The issue before us is whether the parties intended to limit the guarantors' consent to future extensions and renewals to the interest rate set in the original note.

Here, the guaranty agreement does not expressly provide that the guarantors consented to a future increase in the rate of interest. And, the fact that guarantors consented to a future "extension" or "renewal" of the note does not necessarily imply that they also consented to an increase in the interest rate.

An "extension" or "renewal" note extends the time for payment of principal beyond the original period of the note, *see Black's Law Dictionary* 525 (5th ed. 1979), and necessarily increases the total amount of interest to be paid. However, such an increase in the amount of interest to be paid is dependent on the extension of time rather than a change in the interest rate to be applied to the debt. Since the guaranty must be strictly construed, we conclude that the language in the guaranty authoriz-

ing extensions and renewals neither contemplates nor authorizes an increase in the rate of interest. *See Liberty National Bank v. Dvorak*, 199 N.W.2d 414 (N.D. 1972).

### C.

Guarantor Conger maintains that if the trial court finds he otherwise consented to the material alterations, and that he had no authority to bind the remaining guarantors, he would still be entitled to a partial discharge. He argues that since, under those circumstances, the remaining guarantors would be totally discharged by operation of law, he should be discharged to the extent that he could have claimed contribution from his discharged co-guarantors. We disagree.

■■■ A creditor's release of a guarantor, without the consent of the remaining co-guarantors, discharges the remaining co-guarantors to the extent of their contributive share. *Western Bank v. Aqua Leisure, Ltd.*, 105 N.M. 756, 737 P.2d 537 (1987); *Newburger v. Lubell*, 266 N.Y. 4, 193 N.E. 440 (1934). *See also* Restatement of Security § 135(1) (1941). However, if the discharge of a guarantor's obligation results from operation of law, it generally has no effect upon the obligations of the remaining co-guarantors. L. Simpson, *Handbook of Law of Suretyship* § 79 (West 1951); Restatement of Security § 134 (1941). Hence, if a creditor and a principal debtor alter the obligation to the detriment of co-guarantors, some of whom consent while others do not, those not consenting are discharged, but those consenting remain bound. *See Mundy v. Stevens*, 61 F. 77 (3rd Cir.1894); *Westveer v. Landwehr*, 276 Mich. 326, 267 N.W. 849 (1936); *but see Hallock v. Yankey*, 102 Wis. 41, 78 N.W. 156 (1899).

### II.

After the corporation defaulted on the note, the creditors took possession of the personal property which secured that payment. At that time, creditors took an inventory of the property. They subsequently notified guarantors that they planned to sell the repossessed collateral. Thereafter, creditors held a private sale of the property and bought the items themselves. At trial, guarantors asserted that this was a commercially unreasonable sale under § 4–9–504(3), C.R.S., of the Uniform Commercial Code. The trial court, however, concluded that the U.C.C. did not apply to this case because, in their original guaranty agreement, the guarantors had waived any rights which the U.C.C. might otherwise have granted them. We disagree with this conclusion.

### A.

Section 4–9–504(3), C.R.S., imposes two requirements upon a reselling creditor: (1) the creditor must generally send notice; and (2) every aspect of the sale, including the method, manner, time, place, and terms must be "commercially reasonable." Accordingly, although a creditor is authorized to sell collateral by either public or private sale, he is permitted to purchase the collateral at a private sale only when: (1) "the collateral is of the type customarily sold in a *recognized market*," or (2) it "is of a type which is the subject of widely distributed *standard price quotations*." (emphasis supplied)

■■ Further, § 4–9–501(3)(b), C.R.S., provides that, to the extent that the requirements of § 4–9–504(3), C.R.S., grant rights to a debtor or impose duties upon a creditor, those duties and rights may not be waived. And, parties who are liable for deficiencies, such as guarantors here, are "debtors" within the meaning of this statute. *First National Bank v. Cillessen*, 622 P.2d 598 (Colo.App.1980). Thus, the guarantors' purported pre-default waiver of a commercially reasonable sale was void.

■■ For purposes of § 4–9–504(3), a "recognized market" is one in which sales consist of numerous items so similar that individual differences are absent or irrelevant, in which bartering and competitive bidding are not major factors in each sale, and in which the prices paid in actual sales of comparable property are currently available by quotation. *See Community*

*Management Ass'n v. Tousley,* 32 Colo. App. 33, 505 P.2d 1314 (1973) (automobiles are not items sold in a "recognized market"); *1st Charter Lease Co. v. McAl, Inc.,* 679 P.2d 114 (Colo.App.1984) (same rule applied to computer hardware).

Here, an expert testified that the individual differences in age and condition of the items sold by creditors, which consisted of restaurant equipment and furniture, could not be evaluated without being inspected by a person with knowledge and expertise in the business. This undisputed testimony established that there was no recognized market for this property and that the items were not subject to a widely distributed standard price quotation. Thus, as a matter of law, the creditors' sale of the property to themselves was commercially unreasonable. Section 4-9-504(3), C.R.S.

A commercially unreasonable sale creates a rebuttable presumption that the value of the repossessed collateral is at least equal to the amount of the outstanding debt and that, therefore, no deficiency results from the sale. *Community Management Ass'n v. Tousley, supra.* This presumption may be overcome, however, by evidence other than that of the amount received from the sale. *1st Charter Lease Co. v. McAl, Inc., supra.*

Here, creditors' expert, who appraised the repossessed collateral, testified that its fair market value was $43,091, which was the price paid by creditors. There was no other testimony as to the collateral's value. This evidence, if deemed credible by the fact finder, was, therefore, sufficient to overcome the statutory presumption and to establish the reasonableness of the sales price paid by creditors. However, the trial court was not bound to accept this testimony as credible, even though it was undisputed, *see Pioneer Construction Co. v. Richardson,* 176 Colo. 254, 490 P.2d 71 (1971), and because the court did not consider the effect of this evidence upon the statutory presumption created by the U.C.C., it is necessary to remand this matter to the trial court for its consideration, and for further findings of fact.

## B.

Guarantors also presented evidence that several items listed in creditors' inventory were missing from the bill of sale issued at the time of sale. Some of these items included an oak desk, booths and a table, an antique fire alarm, and a disco podium. Creditors' agent testified that he was unable to account for these items.

Guarantors contend that the lack of evidence of the sale of the items constitutes an implied retention by the creditors of the non-disposed collateral in full satisfaction of the debt under § 4-9-505, C.R.S. In addition, guarantors assert that this was a breach of the duty owed by secured parties under § 4-9-207, C.R.S., to protect and to preserve collateral in their custody and control. Again, however, since the trial court found that guarantors had waived all of their rights under the U.C.C., it made no findings upon these assertions. Therefore, on remand, the trial court will also be required to make findings upon these issues.

## C.

Finally, sometime after creditors took possession of the premises in September 1983, a theft occurred. The items stolen were a large screen television valued at approximately $3,000, two turntables, an amplifier, telephone message equipment, and a master control unit. The creditors filed a claim with their insurance company and were paid $6,965.31. Guarantors contend that they were not given an offset against the debt which reflected creditors' receipt of these insurance proceeds. While creditors assert that credit was given, the trial court did not make any findings upon this issue, and it should do so on remand.

The judgment is reversed and the cause is remanded to the trial court for further proceedings consistent with this opinion.

PIERCE and CRISWELL, JJ., concur.