FODALE v WASTE MANAGEMENT OF MICHIGAN, INC

Docket No. 253446. Submitted May 10, 2005, at Detroit. Decided May 2, 2006, at 9:05 a.m.

Samuel Fodale brought an action in the Oakland Circuit Court against Waste Management of Michigan, Inc., claiming violation of article 9 of the Uniform Commercial Code (MCL 440.9101 *et seq.*), breach of contract, and unjust enrichment, all relating to a collateralized loan extended by the defendant and the defendant's disposition of the collateral. The court, Patrick J. Brennan, J., granted summary disposition for the defendant on all three claims. The plaintiff appealed.

The Court of Appeals *held*:

1. The collateral for the defendant's loan to the plaintiff included an option to purchase the plaintiff's interest in a redemption agreement at a fixed price, which option is the salient collateral when determining that the plaintiff's defaults and the defendant's actions must be reviewed under the version of article 9 of the UCC in effect at the relevant times. The fixed-price option was an intangible property interest that functioned as collateral and fulfilled the purpose of collateral. When the defendant exercised the option to acquire the property interest, it disposed of the collateral within the meaning of article 9 of the UCC.

2. The circuit court erred in finding that the loan agreements between the parties had not violated several of the plaintiff's postdefault rights. Former MCL 440.9501 *et seq.*, as amended by 1978 PA 369, provided that, after default, the debtor was entitled to notice of disposition of collateral, was entitled to a commercially reasonable disposition of the collateral, and, in general, was entitled to payment of any surplus realized in the disposition of the collateral. Only under specific conditions might notice be waived before the default, none of which applies in this case. Plaintiff did not sign a statement renouncing his right to receive notification of disposition after he defaulted. If the defendant disposed of the collateral by accepting it in payment of the debt, that violated the plaintiff's right to the statutory requirement of a notice of disposition, former MCL 440.9501(3)(b), as amended by 1978 PA 369.

Because the plaintiff's interest in the redemption agreement was not collateral of a type customarily sold in a recognized market or of a type that was the subject of widely distributed standard price quotations, it was not the type of collateral that a secured party was permitted to purchase at a private sale as a commercially reasonable disposition of collateral, a violation of former MCL 440.9504(3), as amended by 1978 PA 369. Because the security agreement did not provide for the debtor to have entitlement to any surplus of the proceeds of the disposition of the collateral over the debt owed, the debtor was not entitled to any surplus upon sale of the collateral. The failure of the defendant to pay the plaintiff any surplus was not a violation of former MCL 440.9502(2), as amended by 1978 PA 369.

3. Former MCL 440.9506, as amended by 1978 PA 369, allowed the debtor to redeem collateral at any time before the secured party had collected, disposed of, or accepted the collateral as satisfaction of the debt. Because the parties' contract did not address the interval, if any, between the plaintiff's default and the effective date of the defendant's decision to purchase the collateral, the provision did not constitute an unlawful predefault waiver of the plaintiff's right to redeem the collateral. The plaintiff never had an opportunity to redeem the collateral because the defendant's letter advising the plaintiff that the defendant was electing to acquire the collateral was effective immediately. If the defendant purchased the plaintiff's collateral effective immediately, however, it violated the statute.

4. The defendant's letter stating that the defendant was exercising its option to acquire the plaintiff's interest in the redemption agreement effective immediately stated that the exercise was in forgiveness of plaintiff's debts, waiving the defendant's right to seek a deficiency judgment. This forgiveness demonstrates a proposal of accepting the collateral in satisfaction of the plaintiff's debt, rather than a selling of the collateral at a private sale. The plaintiff failed to object in writing within 21 days after the notice was sent. Former MCL 440.9505, as amended by 1978 PA 369. That failure is fatal to all of the plaintiff's other assignments of error.

5. The circuit court reached the proper conclusion regarding dismissal of the plaintiff's claim for breach of the contractual duties of good faith and fair dealing. Because Michigan does not recognize a common-law cause of action for breach of the implied covenants of good faith and fair dealing, reliance by the plaintiff on the common law did not prevent dismissal of the claim. To the extent that the plaintiff relied on the UCC provision relating to good faith, MCL 440.1203, the plaintiff failed to provide support

for the assertion that a mere claimed violation, without factual evidence of bad faith, can support a conclusion that MCL 440.1203 has been violated.

6. The circuit court did not err in dismissing the plaintiff's claim of unjust enrichment. Unjust enrichment is an equitable doctrine under which a contract is implied to prevent inequity if there is no express contract covering the same subject matter. In this case, there was an express contract. In addition, before filing suit, the plaintiff had defaulted six times on the loan agreement and had slept on the rights afforded by the UCC when he failed to object to the defendant's proposal to accept the collateral in satisfaction of the debt.

Affirmed.

SAAD, P.J., concurring, agreed that the plaintiff waived his rights under the UCC by acquiescing in the defendant's purchase of the collateral to satisfy the underlying debt obligation. Judge SAAD would refrain from addressing the other issues addressed by the majority.

1. SECURED TRANSACTIONS — UNIFORM COMMERCIAL CODE — ARTICLE 9 OF THE UCC — OPTIONS.

An option to purchase an interest in a financial agreement is an intangible property interest covered by article 9 of the Uniform Commercial Code where it functions as collateral and fulfills the purpose of collateral, and where the contract under which it was pledged was intended to create a security interest (Former MCL 440.9102, as ameneded by 1978 PA 369, now MCL 440.9109).

2. SECURED TRANSACTIONS — UNIFORM COMMERCIAL CODE — DEBTORS' RIGHTS — POSTDEFAULT.

After default, a debtor is entitled to notice of disposition of collateral, is entitled to a commercially reasonable disposition of the collateral, and, in general, is entitled to payment of any surplus realized in the disposition of the collateral (Former MCL 440.9501 *et seq.*, as amended by 1978 PA 369, now MCL 440.9601 *et seq.*)

3. SECURED TRANSACTIONS — UNIFORM COMMERCIAL CODE — DISPOSITION OF COLLATERAL — REDEMPTION PERIOD.

A debtor's failure to object within 21 days to the proposed disposition of collateral after a default in a secured transaction under article 9 of the Uniform Commercial Code is fatal to the debtor's later claims regarding disposition of collateral and any surplus realized in the disposition of collateral (Former MCL 440.9505, as amended by 1978 PA 369, now MCL 440.9620).

4. CONTRACTS — UNIFORM COMMERCIAL CODE — DUTY OF GOOD FAITH — DUTY OF
   FAIR DEALING.

   Michigan does not recognize a common-law cause of action for
   breach of the implied covenants of good faith and fair dealing; a
   claim of a breach of those duties under the Uniform Commercial
   Code without factual evidence of bad faith is insufficient to
   establish a violation of the code (MCL 440.1203).

*Honigman Miller Schwartz & Cohn LLP* (by *Grant
R. Trigger* and *Jennifer Zbytowski Belveal*) for the
plaintiff.

*Williams Acosta, PLLC* (by *Victor J. Torres*), for the
defendant.

Before: SAAD, P.J., and ZAHRA and SCHUETTE, JJ.

PER CURIAM. Plaintiff Samuel Fodale appeals as of
right the trial court's grant of summary disposition in
favor of defendant Waste Management of Michigan,
Inc., on his claims of violation of article 9 of the
Uniform Commercial Code (UCC), breach of contract,
and unjust enrichment. We affirm.

I. FACTS

This case arises from a series of interrelated agree-
ments between the parties and their predecessors in
interest. In 1983, defendant[1] and Eagle Valley, Ltd., of
which plaintiff was a shareholder, entered into an
agreement (1983 assignment) whereby Eagle Valley,
Ltd., assigned all its rights in a proposed landfill to
defendant; in return, defendant assigned to Eagle Val-
ley, Ltd., a right to 50 percent of the landfill's future
profits. In 1984, Eagle Valley, Ltd., entered a redemp-

---

[1] Plaintiff and Eagle Valley, Ltd., originally contracted with Waste
Management Systems, which is a predecessor of defendant Waste Man-
agement of Michigan.

tion agreement (1984 redemption agreement) whereby it assigned all its assets and liabilities to its shareholders in proportion to their shares of ownership. Plaintiff was entitled to ten percent of the assets of Eagle Valley, Ltd., under this agreement, and thus was entitled to five percent of defendant's total profits from the Eagle Valley Landfill pursuant to the 1983 assignment.

In 1987, defendant loaned $250,000 to plaintiff. The loan agreement had three parts: an agreement (1987 agreement), a note (1987 note), and a collateral assignment (1987 collateral assignment) (collectively, the 1987 loan agreements). The 1987 loan agreements gave defendant two options for recovering on the loan in the event of plaintiff's default. First, the 1987 loan agreements provided that, if plaintiff defaulted, defendant received an option to buy plaintiff's interest in the 1984 redemption agreement[2] for $350,000, less the amount plaintiff owed defendant at the time of default; in the event defendant exercised this option, plaintiff's remaining obligations to defendant would be satisfied. Second, the 1987 collateral assignment offered plaintiff's "interest" in the Eagle Valley Landfill *itself* as collateral.

Between December 1987 and August 1992, plaintiff failed to pay on the loan six times, but the parties were able to amend the agreement, each time increasing the amount plaintiff owed defendant.[3] On July 30, 1998,

---

[2] Until this Court requested supplementary briefs regarding the applicability of article 9, the parties loosely referred to plaintiff's interest as his "interest in the landfill." Greater precision is required for this analysis, however: plaintiff's actual interest, as discussed at greater length later in this opinion was actually in profits from the landfill that were owed plaintiff by defendant.

[3] No other changes were made to the agreement; all the "amended agreements" contain the same option and collateral assignment provisions.

apparently after many attempts to contact plaintiff about a seventh default, defendant notified plaintiff by letter that it was exercising its option to purchase his "interest" in Eagle Valley and that this satisfied plaintiff's obligations under the note to defendant.

In 2002, plaintiff sued defendant, claiming (1) violation of part 6 of article 9 of the UCC, MCL 440.9601 *et seq.*; (2) breach of contract (breach of implied covenant of good faith and fair dealing); and (3) unjust enrichment. The trial court granted summary disposition in favor of defendant pursuant to MCR 2.116(C)(8) and (10) on all three counts. This appeal ensued. Before evaluating plaintiff's assignments of error, this Court requested supplementary briefs to determine whether article 9 of the UCC (secured transactions) controlled the parties' agreement.

## II. STANDARD OF REVIEW

A trial court's decision granting summary disposition is reviewed de novo to determine whether the prevailing party was entitled to judgment as a matter of law. *Allen v Keating*, 205 Mich App 560, 562; 517 NW2d 830 (1994). When reviewing a motion under MCR 2.116(C)(10), the Court must examine the documentary evidence presented below and, drawing all reasonable inferences in favor of the nonmoving party, determine whether a genuine issue of material fact exists. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). A question of fact exists when reasonable minds could differ regarding the conclusions to be drawn from the evidence. *Glittenberg v Doughboy Recreational Industries (On Rehearing)*, 441 Mich 379, 398-399; 491 NW2d 208 (1992).

Questions of statutory interpretation are also reviewed de novo. *Heinz v Chicago Rd Investment Co*, 216 Mich App 289, 295; 549 NW2d 47 (1996). Questions involving the proper interpretation of a contract or the

legal effect of a contractual clause are likewise reviewed de novo. *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005).

### III. APPLICABILITY OF THE UNIFORM COMMERCIAL CODE

Threshold issues regarding the applicability of the UCC must be addressed before this Court considers plaintiff's assignments of error regarding waiver of UCC debtor's rights, as well as his actions for breach of contract and unjust enrichment, which depend on the applicability of the UCC.

#### A. CONTROLLING VERSION OF ARTICLE 9

Plaintiff argues that the trial court erred in dismissing his claims based on article 9 of the UCC, MCL 440.9101 *et seq.*, governing secured transactions. While both parties refer to part 6 of article 9, MCL 440.9601 *et seq.*, that part did not become effective until July 1, 2001, nearly three years after defendant's challenged purchase of plaintiff's collateral occurred. Before July 2001, defaults were governed by part 5 of article 9, as amended by 1978 PA 369 former MCL 440.9501 *et seq.* (hereafter, the 1979 version).[4] Those sections were in effect in 1987, when the parties' contract was executed, and in 1998, when the contested transaction took place. Therefore, former part 5 controls this case. We occasionally refer to current provisions in our analysis because the pertinent provisions of the former and the current versions of the UCC are similar in substance, if not organization.

#### B. SUBJECT MATTER OF THE COLLATERAL

At oral argument, this Court asked the parties to file supplemental briefs to answer whether former article 9

---

[4] Part 5 of article 9 now governs financing statements.

of the UCC applies to the 1987 loan agreements. Plaintiff answered that article 9 applies. We agree.

As an initial matter, the parties and the trial court misidentified the pertinent collateral in the 1987 loan agreements when determining whether article 9 applied to the transaction. While both parties argue that plaintiff's interest in the 1984 redemption agreement was the pertinent collateral, *the option to purchase* plaintiff's interest in the 1984 redemption agreement was also collateral. Indeed, because defendant actually disposed of this latter collateral,[5] this option, rather than the collateral specified in the 1987 collateral assignment, is the salient collateral when determining whether the 1987 loan agreements fall within the scope of article 9.

Throughout the litigation, the parties have referred to the 1987 loan agreements as one document, although they actually are three complexly interacting components: the 1987 agreement, the 1987 note, and the 1987 collateral assignment. Though the provisions may be located in particular components, their location is not as important as their substance when the 1987 loan agreement documents are read as a whole. See *Brown v Yousif*, 445 Mich 222, 231; 517 NW2d 727 (1994). Although the 1987 collateral agreement, if read in isolation, seems to give plaintiff's interest in the 1984 redemption agreement as the sole security for the loan, the 1987 loan agreement, when read as a whole, actually give defendant additional collateral: an option to buy plaintiff's interest in the 1984 redemption agreement at a fixed price. Paragraph 4 of the 1987 agreement states:

> As further consideration and inducement for the loan . . . [plaintiff] hereby agrees that if he should de-

---

[5] See part III(C) of our analysis.

fault ... [defendant] may elect, *as full satisfaction of the Note*, to purchase his entire right, title and interest in and to the Agreement for $350,000.00 less the unpaid balance of the Note and any interest then due thereunder. ... [Emphasis added.]

Although not labeled as such, this clause effectively operates as a collateral assignment, and this Court has ruled that article 9 applies to any transaction—regardless of form—that is intended to create a security interest in personal property. *Yamaha Motor Corp, USA v Tri-City Motors & Sports, Inc*, 171 Mich App 260, 276-277; 429 NW2d 871 (1988) (even when an original security interest fell under article 2 of the UCC, it could evolve into an article 9 interest); *Nickell v Lambrecht*, 29 Mich App 191, 194; 185 NW2d 155 (1970) (despite the form of a lease, the agreement was a conditional sale and a secured transaction). When parties create a security interest, they intend to empower the secured party to recover at least part of the debtor's obligations. The parties created the paragraph 4 option with precisely this intent: to provide a means by which defendant might recover plaintiff's obligations should he default.

Not only did the option fulfill the purpose of collateral, it also functioned as collateral. Typically, collateral remains in the possession of the debtor;[6] only the condition precedent of the debtor's default forces relinquishing possession so that the secured party may dispose of the collateral. Both plaintiff's interest in the 1984 redemption agreement and the option created by paragraph 4 of the 1987 agreement followed this rule: plaintiff's default was a condition precedent to defen-

---

[6] Unless, of course, the collateral is placed in consignment. Consignments have special rules and circumstances in addition to those of a traditional secured transaction. No consignment was involved in this case.

dant's ability to access them in an effort to satisfy
plaintiff's outstanding debt. Moreover, once plaintiff
defaulted under the 1987 agreement, defendant could
have disposed of the option by exercising or alienating
it.[7] This ability to purchase or alienate is similar to the
rights afforded defendant in the 1987 collateral assign-
ment, as it invokes the rights given a secured party by
the UCC in the event of a default. Accordingly, the
pertinent collateral in this case is not the collateral
named in the 1987 collateral assignment; rather, it is
the option created in paragraph 4 of the 1987 agree-
ment.

Of course, even if the parties intended for the option
to serve as collateral, to be covered by article 9 of the
UCC it must fall under one of the accepted categories of
collateral outlined in former article 9's scope provision,
the 1979 version of MCL 440.9102. The scope of article
9 is broad: except for transactions that are specifically
excluded by other sections of the code, the 1979 version
of article 9 applied to "any transaction (regardless of its
form) which is intended to create a security interest in
personal property or fixtures . . . ."[8] MCL 440.9102,
1979 version; see also current MCL 440.9109.

While Michigan courts have not ruled on whether an
option constitutes personal property, the Michigan Su-
preme Court has ruled that " '[p]ersonal property'

---

[7] Again, substance trumps form. Although it is not readily apparent
that the option could be sold just like the collateral described in the 1987
collateral assignment, it indeed could through the assignment of defen-
dant's interests under the 1987 loan agreements: "This Agreement shall
be binding on the executors, heirs, representatives and successors and
assigns of the parties hereto."

[8] Indeed, as discussed above, the Michigan Supreme Court has ruled
that even transactions explicitly excluded by the UCC can be brought
within this article's scope if the parties so intend. *Shurlow v Bonthuis*,
456 Mich 730, 734-738; 576 NW2d 159 (1998).

connotes intangible as well as tangible personal property and must include choses in action." *Royal Oak Twp v City of Berkley*, 309 Mich 572, 580; 16 NW2d 83 (1944). Options, like choses in action, are intangible property interests. See Black's Law Dictionary (8th ed) (defining "personal property" as "[a]ny movable or intangible thing that is subject to ownership and not classified as real property"). Further, other authorities have recognized options as intangible personal property in various contexts.[9] See *In re Buckner*, 224 BR 760, 762 (ED Mo, 1998) (bankruptcy proceeding); *In re Estate of Nowell*, 607 SW2d 792, 795 (Mo App, 1980) (will contest); *Lawrence v O'Connell*, 141 F Supp 316, 321 (D RI, 1956) (tax dispute). Moreover, a ruling that an option is not collateral that would bring an agreement within the purview of article 9 would give future contracting parties an enormous go-around to avoid the debtor protections of article 9, which is exactly the phenomenon against which the UCC's scope provisions protect. Finally, options are not excluded from article 9 pursuant to the 1979 version of MCL 440.9104. In conclusion, article 9 applies to the 1987 loan agreements.[10]

---

[9] "When uniform laws such as the UCC have been adopted by several states, the courts of one state may refer to decisions from another state and may construe the statutes in accordance with the construction given by that state. If there is no harmony of construction among the various states, the forum court will adopt the construction which seems most reasonable." *Yamaha Motor Corp, USA, supra* at 270, citing 2A Sands, Sutherland Statutory Construction (4th ed), § 52.05, p 546.

[10] Alternatively, it may be established that the parties brought the 1987 loan agreements within the scope of article 9 through their intent. Our Supreme Court has ruled that the Legislature intended article 9 to be of general applicability, covering all types of security interests in personal property, regardless of their form. *Brown, supra* at 231. Thus, provisions regarding the article's scope have normally been construed in favor of inclusion. *Shurlow, supra* at 735-737. This Court examines the intent of the parties entering into a transaction, rather than the form of their

C. APPLICABILITY OF ARTICLE 9, PART 5

Defendant argues that, even if article 9 of the UCC applies generally, part 5, which governs a debtor's rights during the disposition of the collateral, does not apply for the reason that defendant never disposed of the collateral. We disagree.

The UCC does not define the term "disposition." *Silverberg v Colantuno*, 991 P2d 280, 288 (Colo App, 1998). However, both the former MCL 440.9504(1) and the current MCL 440.9610(1) state that after default a secured party "may *sell*, lease, license, *or otherwise dispose of* any or all of the collateral . . . ." (Emphasis

---

agreement. *Id.* at 735 n 10. Indeed, when the parties have so agreed, our Supreme Court has been willing to apply article 9 to agreements despite express exemptions in the scope provision. *Id.* at 735 (bringing an agreement within the scope of article 9 despite the express statutory exclusion of a landlord's liens).

In this case, the parties invoked the UCC and sought to define "commercially reasonable notice" for the purpose of a UCC analysis in the 1987 collateral assignment:

Upon occurrence of a default . . . [defendant] shall then have the rights, options, duties and remedies of a secured party under the Uniform Commercial Code of Michigan. . . . . Any requirement of the Code for reasonable notice to [plaintiff] shall be met if such notice is mailed, postage prepaid, to [plaintiff], at [his] address . . . .

Throughout the document, the parties used the terminology and concepts of article 9, including "disposition," "deficiency," "priority of creditors," and "security." After reading the 1987 loan agreements, it is not surprising that the parties presumed that article 9 was applicable until the Court raised the issue. Moreover, given that defendant sought the protections afforded secured parties by the UCC, it is counterintuitive not to obligate it to follow the corresponding debtor protection provisions. To borrow a phrase from another context, the parties to the agreement should have to "take the bitter with the sweet." *Arnett v Kennedy*, 416 US 134, 154; 94 S Ct 1633; 40 L Ed 2d 15 (1974) (opinion by Rehnquist, J.) (within the context of due process).

added.) Additionally, both current § 9610(3) and former § 9504(3), which require commercially reasonable *disposition* of collateral, address a secured party's purchase of the debtor's collateral at a private sale. These provisions clearly indicate that a purchase by the secured party is a disposition within the meaning of article 9.[11]

Although there are no published Michigan cases specifically addressing the meaning of "disposition" in this context, in *Silverberg*, *supra* at 289, the Colorado Court of Appeals persuasively concluded that "an examination of the default provisions of article 9 of the UCC leads us to conclude that 'disposition' upon default was intended to refer to a transfer of some portion of the *creditor's* interest in the collateral *and* a transfer of the *debtor's* interest." (Emphasis in original.)[12] The court added:

> [The] application of the ejusdem generis principle of statutory construction supports the same result. The words "otherwise dispose" follow "sell" and "lease." The latter two terms contemplate a disposition terminating, altering, suspending, or transferring the rights of possession and ownership that both a debtor and a secured party enjoy. Hence, a "disposition" must mean a similar transaction. [*Id.*]

In this case, although defendant did not transfer its rights in the collateral to a third party, it terminated

---

[11] Although MCL 440.9615(6) is inapplicable to this case, it also contemplates that the creditor may *dispose* of collateral by purchasing it (and may thereby become liable for the difference between the purchase price and the fair market value of a collateral). As plaintiff observes, MCL 440.9615(6) would be rendered meaningless if a contractually agreed purchase in the event of default were not considered a disposition.

[12] See also Black's Law Dictionary (8th ed) ("[D]isposition" is defined as "[t]he act of transferring something to another's care or possession, esp. by deed or will; the relinquishing of property . . . .").

and transferred to itself all of *plaintiff's* rights in the
collateral. Thus, although *Silverberg* is not binding on
this Court, it supports the conclusion that terminating
the debtor's rights in the collateral is a disposition even
if the transfer is to the secured party.

When defendant exercised the option to buy plain-
tiff's interest in the 1984 redemption agreement, it
"disposed" of the collateral within the meaning of
article 9. For these reasons, we conclude that the trial
court erred in finding that there was no disposition in
this case. Now that we have established that former
article 9 and part 5 apply, we turn to the question
whether plaintiff waived any of his debtor's rights
under part 5.

#### IV. PLAINTIFF'S POSTDEFAULT DEBTOR'S RIGHTS

Plaintiff's first count argues that the provision allow-
ing defendant to purchase plaintiff's collateral for
$350,000, less any outstanding balance owed under the
parties' promissory note, was an unlawful predefault
waiver of rights under former MCL 440.9501, specifi-
cally an invalid waiver of (A) the right to notice of
disposition, (B) the right to a commercially reasonable
disposition of the collateral, and the right (C) to the
payment of a surplus.

To protect debtors, former MCL 440.9501(1) pro-
vided that, after default, "a secured party has the rights
and remedies provided in this part and except as limited
by subsection (3) those provided in the security agree-
ment." Former subsection 3 read in pertinent part:

> To the extent that they give rights to the debtor and
> impose duties on the secured party, the rules stated in the
> subsections referred to below may not be waived or varied
> except as provided with respect to compulsory disposition
> of collateral (section 9504(3) and section 9505) and with

respect to redemption of collateral (section 9506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable:

(a) subsection (2) of section 9502 and subsection (2) of section 9504 insofar as they require accounting for surplus proceeds of collateral;

(b) subsection (3) of section 9504 and subsection (1) of section 9505 which deal with disposition of collateral;

(c) subsection of section 9505 which deals with acceptance of collateral as discharge of obligation;[13]

(d) section 9506 which deals with redemption of collateral; and

(e) subsection (1) of section 9507 which deals with the secured party's liability for failure to comply with this part. [MCL 440.9501(3), 1979 version.]

Therefore, that version of MCL 440.9501(3) prohibited a waiver of the rights to notice of disposition, a commercially reasonable disposition, and an accounting of any surplus. These alleged waivers are discussed more fully below.

### A. NOTICE OF DISPOSITION

Under former § 9501(3)(b), defaulting debtors had a right to a notice of disposition of the collateral, which could not be waived except by a writing signed after default pursuant to former § 9501(3)(b).[14] In this

---

[13] An exception that will prove particularly important in our analysis in part IV(E).

[14] The 1979 version of MCL 440.9504(3) stated, in pertinent part:

Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or

case, the collateral—the option to purchase a right to profits under the 1984 redemption agreement—was not "perishable," did not "threaten[] to decline speedily in value," and was not "of a type customarily sold on a recognized market." MCL 440.9504(3), 1979 version. Moreover, plaintiff did not sign a statement renouncing his right to receive notification of disposition after he defaulted. Rather, defendant sent plaintiff a letter stating that, "effective immediately," it was invoking its contractual right to exercise its option to purchase plaintiff's interest in the 1984 redemption agreement. Although defendant argues that the letter could be considered "reasonable notification of the time after which any private sale . . . is to be made," such an interpretation would render the nonwaiveable protections of this requirement meaningless. Consequently, if defendant indeed disposed of the collateral as described in the contract, it violated plaintiff's right to a notice of disposition pursuant to MCL 440.9504(3), 1979 version.

### B. COMMERCIALLY REASONABLE DISPOSITION OF COLLATERAL

Former § 9504(3)[15] also provided:

> Disposition of the collateral may be by public or private proceedings and may be made by way of 1 or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method,

---

other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of the sale.

[15] The current provision, MCL 440.9610, contains clarifying language that is in accord with case law interpreting former § 9504. See, e.g., *Bank of America v Lallana*, 19 Cal 4th 203; 77 Cal Rptr 2d 910; 960 P 2d 1133 (1998); *Liberty Nat'l Bank of Fremont v Greiner*, 62 Ohio App 2d 125; 405 NE2d 317 (1978).

> manner, time, place, and terms must be commercially
> reasonable. . . . The secured party may buy at any public
> sale and if the collateral is of a type customarily sold in a
> recognized market or is of a type which is the subject of
> widely distributed standard price quotations he may buy at
> a private sale.

As discussed above, former § 9501(3)(b) prohibited the waiver of these rights.[16] Unlike the current statute,[17] the antiwaiver provision of former § 9501 did not separately address whether a secured party could purchase collateral at a private sale. Thus, under former article 9, a debtor could not waive the requirement that a creditor could only purchase collateral at a private sale if it "is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations . . . . " See e.g., *Pennsylvania House, Inc v Juneau's Pennsylvania House, Inc*, 791 F Supp 160, 162 (ED Tex, 1992); *Cooper Investments v Conger*, 775 P2d 76, 80 (Colo App, 1989); *Mercantile Bank & Trust v Cunov*, 749 SW2d 545, 548 (Tex App, 1988).

In this case, the 1987 loan agreements provided that if plaintiff defaulted on the loan and failed to cure the default within ten days, defendant "may elect, as full satisfaction of the Note, to purchase his entire right, title and interest in and to [plaintiff's interest in the 1984 redemption agreement] for $350,000.00 less the unpaid balance of the Note and any interest then due thereunder." The contract did not include a provision for a public sale with meaningful opportunity for com-

---

[16] An exception to that section pertained to compulsory disposition of the collateral in cases involving consumer goods.

[17] Current § 9610(3) states, "A secured party may purchase collateral either at a public disposition, or at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations."

petitive bidding. Thus, we conclude that the contract purported to allow defendant to purchase plaintiff's collateral at a private sale.

It is undisputed that plaintiff's interest in the 1984 redemption agreement was not of "a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations." Therefore, it was not the type of collateral that a secured party was permitted to purchase at a private sale, even with the debtor's consent. We conclude that the provision permitting defendant to purchase plaintiff's collateral at a private sale constituted a waiver of the requirement of a commercially reasonable disposition under former § 9501(3)(b) and, hence, was unlawful. Additionally, if defendant indeed purchased the collateral at a private sale, this purchase was commercially unreasonable and violated former § 9504(3). See, e.g., *Munao v Lagattuta*, 294 Ill App 3d 976, 981-982; 691 NE2d 818 (1998); *Carlton Mfg v Bauer*, 207 Ga App 850, 851-854; 429 SE2d 329 (1993); *Cooper Investments*, *supra* at 80-81; *Mercantile Bank & Trust*, *supra* at 548.

### C. PAYMENT OF SURPLUS

Former MCL 440.9504(2), concerning a secured party's right to dispose of collateral after a default, provided:

> If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. But if the underlying transaction was a sale of accounts or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency *only if the security agreement so provides*. [Emphasis added.][18]

---

[18] Similarly, former MCL 440.9502(2), concerning a secured party's attempt to collect from its debtor's accounts receivable, provided, in pertinent part:

In this case, plaintiff alleges that the collateral was worth substantially more than the contract price paid by defendant. However, the 1987 loan agreements did not provide plaintiff with the right to a surplus. Consequently, plaintiff does not have a claim for a surplus under the 1979 version of MCL 440.9504(2).

### D. RIGHT TO REDEEM COLLATERAL

Former § 9506 allowed the debtor to redeem the collateral at any time before the secured party has collected, disposed of, or accepted the collateral as satisfaction of the debt. MCL 440.9506, 1979 version.[19] The debtor could, however, waive the right to redeem under a written agreement entered after default.[20] In this case, the parties' contract does not address the interval, if any, between plaintiff's default and the

---

If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus, and unless otherwise agreed, the debtor is liable for any deficiency. But, if the underlying transaction was a sale of accounts or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.

[19] Former MCL 440.9506 read:

At any time before the secured party has disposed of collateral or entered into a contract for its disposition under section 9504 or before the obligation has been discharged under section 9505(2) the debtor . . . may unless otherwise agreed in writing after default redeem the collateral by tendering fulfillment of all obligations secured by the collateral as well as expenses reasonably incurred by the secured party in retaking, holding and preparing the collateral for disposition, in arranging for the sale, and to the extent provided in the agreement and not prohibited by law, his reasonable attorney's fees and legal expenses.

[20] Again, this is much in accord with the current statute, MCL 440.9623.

effective date of defendant's decision to purchase the collateral. Therefore, the provision does not constitute an unlawful predefault waiver of plaintiff's right to redeem the collateral.

However, defendant's July 30, 1998, letter stated that defendant was exercising its right to purchase the collateral "effective immediately." It is undisputed that there was no interval between defendant's alleged proposal to dispose of the collateral or accept it in satisfaction of the debt and the time it actually accepted or disposed of the collateral after plaintiff's alleged failure to object. In other words, because defendant's letter made defendant's election to purchase the collateral "effective immediately," plaintiff never had an opportunity to redeem the collateral as required by former § 9506—regardless of whether the purchase was an acceptance or a disposition. Defendant's subsequent letter, dated October 8, 1998, offered to "consider reconveyance" of the collateral to plaintiff under certain conditions. However, it did not and could not offer plaintiff an opportunity to redeem the collateral in accordance with former § 9506, because defendant had already disposed of or accepted the collateral.

In *Howard v Lud*, 119 Mich App 55, 63-64; 325 NW2d 623 (1982), this Court held that redemption was unavailable to a debtor who failed to tender full performance under former § 9506 after being notified of the secured party's intention to retain his shares of stock in satisfaction of the debt. However, the decision did not address the secured party's claim that it provided the required notice, but that the plaintiff failed to timely redeem. *Id.* at 63. Thus, the case is distinguishable. We conclude that, if defendant indeed *purchased* plaintiff's

collateral "effective immediately," it violated former § 9506.[21]

### E. ACCEPTANCE OF COLLATERAL IN SATISFACTION OF DEBT

Regardless of the potential violations of plaintiff's rights discussed above, defendant argues that it accepted plaintiff's collateral as payment of plaintiff's obligation. Former MCL 440.9505(2) provided:

> In any other case involving consumer goods[22] or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection. In the case of consumer goods, no other notice need be given. In other cases notice shall be sent to any other secured party from whom the secured party has received . . . written notice of a claim of an interest in the collateral. *If the secured party receives objection in writing from a person entitled to receive notification within 21 days after the notice was sent, the secured party must dispose of the collateral under section 9504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.* [Emphasis added.]

Under former § 9501(3)(c), the provisions of former § 9505(2) could not be waived except by a writing signed

---

[21] Because the language of the statute is clear, there is no need to review *Lewis Broadcasting Corp v Phoenix Broadcasting Partners*, 232 Ga App 94; 502 SE2d 254 (1998), cited by plaintiff, for guidance. Nevertheless, we note that *Lewis* held that a contractual provision allowing a secured party to purchase the debtor's collateral was an unlawful predefault waiver of the debtor's right to redeem. *Id.* at 95-96. While a similar conclusion might be warranted in this case, it is not necessary to a complete resolution of the issues.

[22] The "any other case" refers to the 1979 version of MCL 440.9505(1) and is any case other than a purchase money security interest in which the debtor has paid 60 percent of the cash price.

after default.[23] Indeed, because plaintiff did not sign a postdefault waiver of rights, a written proposal was required.

In this case, defendant sent plaintiff a letter stating that defendant was exercising its option to purchase plaintiff's interest in the 1984 redemption agreement "effective immediately." Under the terms of the letter, plaintiff's debts were forgiven in total, despite the fact that, under the terms of the 1987 loan agreements, defendant could have sought a deficiency judgment against plaintiff. This leads us to conclude that, rather than selling the collateral at a "private sale," as plaintiff alleges, defendant was proposing that it accept the collateral in satisfaction of plaintiff's debt.

While the July 30, 1998, letter did not use tentative terms to describe defendant's intent with regard to the collateral, it clearly expressed defendant's intent to "retain the collateral in satisfaction of the obligation."[24]

---

[23] Except as they pertain to the compulsory disposition of the collateral in certain cases involving consumer goods. See the 1979 version of MCL 440.9501(3); see also MCL 440.9624(2); MCL 440.9620(5).

[24] The use of the word "proposal" in § 9505(2) raises an interesting question of statutory construction. "Propose" is defined as follows:

1. to offer for consideration, acceptance, or action . . . . 2. to offer (a toast). 3. to suggest. 4. to nominate . . . . 5. to plan; intend. . . . 6. to make an offer, esp. of marriage. 7. to form or consider a purpose or design. [*Random House Webster's College Dictionary* (2000).]

All these definitions of "propose" indicate that a proposal is something tentative, whether subject to approval by another party or change by its maker. Defendant's July 30, 1998, letter was written in mandatory, rather than tentative, terms. Defendant expressed an intent to take the collateral "effective immediately."

We conclude that the mandatory nature of defendant's notice of its intent to retain the collateral did not render this notice ineffectual under

Plaintiff failed to "object[] in writing . . . within 21 days after the notice was sent." Under the plain terms of former § 9501(3)(c), plaintiff allowed defendant to accept his interest in the 1984 redemption agreement in satisfaction of his debts. The failure of plaintiff to exercise his express statutory rights under former § 9505(2) is fatal to all of plaintiff's other assignments of error.

### F. CONCLUSION

We conclude that the trial court erred in finding that the 1987 loan agreements had not violated several of plaintiff's postdefault rights. The contractual provision allowing defendant to purchase the collateral at a private sale was an unlawful waiver of the right to a commercially reasonable disposition of the collateral under the 1979 version of MCL 440.9501(3)(b). Further, the authorization under the 1987 loan agreements for the defendant's purchase of the collateral at a private sale was commercially unreasonable and, therefore, violated the 1979 version of MCL 440.9504(3). Finally, because the disposition or alleged acceptance became "effective immediately," it violated plaintiff's right to redeem the collateral under the 1979 version of MCL 440.9506.

Plaintiff's victory on the above issues is pyrrhic: while it gives this Court an opportunity to clarify

---

former § 9505(2). The statute refers to the communication under § 9505(2) as a "notice." See former MCL 440.9505(2) ("In the case of consumer goods, no other *notice* need be given." [Emphasis added.]). Moreover, under the plain terms of the statute, once the secured party communicates its intent to accept the collateral in satisfaction of the debt, the burden shifts to the defaulting debtor to "object[] in writing . . . within 21 days after the notice was sent." Plaintiff clearly had notice of defendant's intention to retain the collateral and plaintiff failed to invoke his rights under former § 9505(2).

debtors' postdefault rights, plaintiff ultimately foreclosed any claims based on these violations when he acquiesced to defendant's proposal to accept the collateral in satisfaction of plaintiff's debt. In regard to his right to be informed of the disposition under former § 9501, plaintiff necessarily knew the means of disposition if he was informed of and acquiesced to defendant accepting the collateral in satisfaction of his debt. Indeed, if, as here, a defaulting debtor fails to object to the secured party's proposal to accept the collateral in satisfaction of the debt, there necessarily will be no sale, whether public or private. Rather, by allowing acceptance of the collateral, the defaulting debtor waives his or her right to *any* sale under former § 9504. Finally, plaintiff's failure to object to defendant's notice of its intent to accept the collateral pursuant to former § 9505(2) necessarily meant that plaintiff did not intend to redeem the collateral under former § 9506. Although defendant violated plaintiff's postdefault rights, plaintiff necessarily waived them when he did not object to defendant's notice of its intent to accept the collateral in satisfaction of plaintiff's debt. Therefore, we uphold the trial court's ruling, because it reached the right result on plaintiff's article 9 claims, albeit for the wrong reason. *In re People v Jory*, 443 Mich 403, 425; 505 NW2d 228 (1993).

### V. BREACH OF CONTRACT

Plaintiff argues that the trial court erred in dismissing his claim for breach of the contractual duties of good faith and fair dealing. We disagree.

Since 1964, the UCC has imposed an obligation of good faith on contracting parties. The applicable version of the UCC in this case was no different, explicitly providing that "[e]very contract or duty within this act imposes an obligation of good faith in its performance

or enforcement." MCL 440.1203. Moreover, the parties could not waive this obligation:

> The effect of provisions of this act may be varied by agreement, except as otherwise provided in this act and except that *the obligations of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed by agreement* but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable. [MCL 440.1102(3) (emphasis added).]

Given the plain language of the statute, we conclude that, unlike cases involving an implied common-law duty of good faith and fair dealing, MCL 440.1203 did not become inoperable in the face of an express contractual provision and that the trial court erred in so concluding. Compare *Eastway & Blevins Agency v Citizens Ins Co of America*, 206 Mich App 299, 302-303; 520 NW2d 640 (1994).

In this case, plaintiff argues that defendant violated its duty of good faith and fair dealing by disposing of the collateral in a commercially unreasonable manner. It is unclear whether plaintiff bases this claim on the implied duties of good faith and fair dealing or on the UCC. However, Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing. *Belle Isle Grill Corp v Detroit*, 256 Mich App 463, 476; 666 NW2d 271 (2003). Therefore, to the extent that plaintiff was relying on the common law, dismissal of this claim was appropriate.

Further, to the extent that plaintiff relies on the UCC, he fails to cite any authority in support of the proposition that, absent any factual evidence of bad faith, the mere breach of a UCC provision can support a claim for violation of § 1203. Compare *Gen Motors*

*Corp v Dep't of Treasury*, 466 Mich 231, 240; 644 NW2d
734 (2002) (Under the UCC, if the plaintiff failed to
"consider complaints under the goodwill adjustment
policy in good faith, it can be sued."). Therefore, we
deem that claim abandoned. *Etefia v Credit Technolo-
gies, Inc*, 245 Mich App 466, 471; 628 NW2d 577 (2001).

In dismissing plaintiff's claim for violation of defen-
dant's duty of good faith, the trial court reached the
right result, albeit for the wrong reason. *In re People v
Jory, supra* at 425. As a result, we affirm.

### VI. UNJUST ENRICHMENT

Lastly, plaintiff argues that the trial court erred in
dismissing his claim for unjust enrichment. We dis-
agree.

Although the trial court indicated that it was dis-
missing this claim under MCR 2.116(C)(8), it looked
beyond the pleadings when considering this claim;
therefore, the claim is properly considered under MCR
2.116(C)(10). *Maiden v Rozwood*, 461 Mich 109, 119;
597 NW2d 817 (1999).

"In order to sustain a claim of unjust enrichment,
plaintiff must establish (1) the receipt of a benefit by
defendant from plaintiff, and (2) an inequity resulting
to plaintiff because of the retention of the benefit by
defendant." *Belle Isle Grill, supra* at 478. "If this is
established, the law will imply a contract in order to
prevent unjust enrichment." *Id*. However, "a contract
will be implied only if there is no express contract
covering the same subject matter." *Id*. Conversely,
where there are questions of fact concerning the exist-
ence and terms of the contract, a claim for unjust
enrichment can be maintained. *Keywell & Rosenfeld v
Bithell*, 254 Mich App 300, 329-330; 657 NW2d 759
(2002).

In this case, an express contract, the 1987 loan agreements, governs the parties' loan. This alone would foreclose plaintiff's unjust enrichment claim. *Belle Isle Grill, supra* at 478. Moreover, the doctrine of unjust enrichment is equitable. *Kammer Asphalt Paving Co, Inc v East China Twp Schools*, 443 Mich 176, 185; 504 NW2d 635 (1993). Plaintiff's case is not equitable. Before plaintiff filed suit, he had failed to pay on the loan six times between December 1987 and August 1992, and had allegedly refused to reply to correspondence from defendant requesting that he refinance for a seventh time. Worse still, plaintiff, a sophisticated businessman, slept on the rights afforded him by the UCC when he failed to object to defendant's proposal to accept the collateral in satisfaction of his debt.

Affirmed.

SAAD, P.J. *(concurring).* I concur with the majority's conclusion that plaintiff waived his rights under the Uniform Commercial Code, MCL 440.1101 *et seq.*, by acquiescing in defendant's purchase of the collateral to satisfy the underlying debt obligation.

However, I would simply uphold the trial court's decision on this narrow basis and, thus, refrain from addressing the other issues in the majority opinion.