*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HARBOR XPRESS, LLC, and XPRESS
PROPERTIES, LLC,

UNPUBLISHED
September 14, 2023

　　　　　Plaintiffs-Appellees,

v

No. 364508
St. Clair Circuit Court
LC No. 21-000055-CZ

YATOOMA OIL, LLC, and MICHAEL
YATOOMA,

　　　　　Defendants-Appellants,

and

LEASE CORPORATION OF AMERICA,

　　　　　Defendant.

Before: LETICA, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

In this action for breach of contract and fraud,[1] defendants, Yatooma Oil, LLC (Yatooma Oil) and Michael Yatooma (Michael), appeal as of right the trial court's judgment following a bench trial in favor of plaintiffs, Harbor Xpress, LLC, and Xpress Properties, LLC. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

On July 5, 2019, a "Management Fee Agreement" was executed between "YATOOMA OIL, LLC, hereinafter called 'Seller,' . . . and Harbor Xpress, LLC . . . hereinafter called 'Manager,' desiring to arrange for the consignment and distribution of Seller's petroleum products

---

[1] The claims of slander of title as well as defendant, Lease Corporation of America (LCA), were dismissed from the litigation and are not pertinent to this appeal.

from the premises located at 6349 Lapeer Road, Kimball, Michigan 48074 (the 'Premises')[.]" This agreement provided in pertinent part:

> 1. This Management Fee Agreement (the "Agreement") shall be for a term of ten (10) years or the sale of 13,000,000 gallons of gasoline, whichever occurs later (the "Term") and shall become effective on the first day the Premises is open for the sale of motor fuel and shall continue in effect until the Term described above is complete.

> 2. Seller shall deliver to Manager at the Premises petroleum products, including gasoline, diesel, lubricants, and such other goods as may be agreed upon. Seller will fix the prices at which the products are to be dispensed by Manager which prices shall be competitive relative to the Premises' market area according to industry practice.

Michael signed the agreement for the "Seller" and listed his title as "Manager," and Antoin Akl (Antoin), plaintiffs' representative, signed the agreement for the "Manager" as identified in the agreement and listed his title as "Authorized Member."

Also on July 5, 2019, these same two individuals signed a "First Amendment to Management Fee Agreement." This document provided, in pertinent part:

> Whereas, Seller and Manager are parties to a Management Fee Agreement dated  July 5th , 2019 (the "Agreement") whereby Manager manages the sale of Seller's motor fuel on commission at the premises located at 6349 Lapeer Road, Kimball, Michigan (the "Premises"); and

> Whereas, the term of the Agreement is 10 years or the sale of 13,000,000 gallons of gasoline, which ever [sic] occurs later; and

> Whereas, Seller has invested approximately $570,000 in petroleum storage and dispensing equipment at the Premises pursuant to the terms of an Investment Agreement between the Parties; and

> Whereas, Manager has requested the option to "buy out" of the Agreement and convert the relationship to a traditional Jobber/Dealer relationship and Seller has agreed to the request;

> NOW, THEREFORE, in consideration of the above and the terms set forth below, the Parties agree as follows:

> 1. Paragraph 28 of the Agreement is deleted and replaced with the following:

> At any time during the Term of the Agreement, Manager my [sic] elect to "buy out" of the Agreement and the Improvement Agreement by: 1) paying Seller an amount equal to $0.0438 per gallon multiplied by the number of gallons of gasoline remaining on the minimum volume (i.e. 13,000,000 gallons minus gallons sold at the Premises prior to the buy out); and 2) executing a new Dealer Supply

Agreement and related agreements for the Premises for the remaining years and months of the Term on Seller's customary terms and conditions. As an example, if Manager elects the buy out after 6,500,000 gallons of gasoline had been sold at the Premises under this Agreement, the buy out amount would be $284,700.00 (6,500,000 x $0.0438 = $284,700.00).

2. All other terms and conditions of the Agreement and Improvement Agreement remain in full force and effect.

Again, on July 5, 2019, an "Improvement Agreement" was executed between Harbor Xpress, LLC as the "Manager" and Yatooma Oil, LLC as "Yatooma." This agreement set forth the consideration and stated in relevant part:

**Now, Therefore**, in consideration of the foregoing premises and the mutual promises and covenants hereinafter contained, the Parties agree as follows:

**1. Term**. This Agreement is effective as to each Party on the first day the Retail Outlet begins the sale of motor fuel to the public and shall remain in effect until expiration of Management Fee Agreement (the "Term"), unless earlier terminated as provided for herein. As used in this Agreement, the term "Contract Year" means each period of 365/366 days during the term that commences on the first day of the Term.

**2. Investment**. YATOOMA agrees to advance funds to purchase and install the equipment and image items set forth on Exhibit A attached hereto for amount set forth on Exhibit A, to be utilized to equip and image the Retail Outlet in accordance with Sunoco's current image and identification standards established for "Branded Outlet". Ownership and title to the Investments shall at all time remain with YATOOMA. The investment will be amortized on a straight line basis over 120 months, 0% interest.

The "Exhibit A" attached to the "Improvement Agreement" provides as follows:

## EXHIBIT A

## INVESTMENT

| EQUIPMENT / IMPROVEMENT | EST. COST |
|---|---|
| Supply and install a complete motor fuel system[] | $450,000.00 |
| 3 multi product dispensers | $ 50,000.00 |
| Sunoco image, including canopy, dispensers, paint | $ 10,000.00 |
| 3 product LED price sign by Everbrite | $ 25,000.00 |
| Labor for sign installation | $ 20,000.00 |

| | |
|---|---|
| Dual commander with ruby 2 POS system | $ 15,000.00 |
| | $570,000.00 |

At the bench trial, Ashley Akl (Akl), a representative of plaintiffs, Bradley Austin Bissett, the chief credit officer for Tri-County Bank, and Michael testified regarding the parties' agreements and financing. Akl testified that a bid to supply and install the gas station equipment was received from Oscar W. Larson Company (Larson), and she believed that it would perform the work. And, defendants represented that they were contributing $570,000 to the project premised on Larson performing the work. However, Michael testified that it was his choice to select the contractor because defendants provided the financing for that aspect of the project. Michael selected the bid of $240,000 submitted by Dynamic Construction & Brothers, LLC (Dynamic). Because of the use of Dynamic, defendants only contributed approximately $378,000 to the project, instead of the $570,000 identified in the contract. Nonetheless, Michael testified that defendants were not obligated to invest the actual $570,000 because the documents used the terms "approximately" or "estimated."

Akl testified that a payback agreement was executed that allowed defendants to recoup their investment. Initially, it was proposed that the payback would require plaintiffs to sell 12,000,000 gallons. However, the ultimate agreement provided that 13,000,000 gallons of gas had to be sold or ten years had to lapse, whichever was later. Akl testified that she would not have agreed to those terms if she had known that defendants would only contribute $378,000 instead of $570,000. In addition to denying the assertion that $570,000 must be invested by defendants, Michael denied that the reduced investment of $378,000 had any bearing on the negotiation and claimed that plaintiffs would receive the benefit of its reduced contribution if they exercised the buyout provision.

Bissett testified that Akl was able to secure financing through Tri-County Bank (the Bank). However, the Bank insisted on occupying the first lien position to secure its interest. When a Mortgagee Waiver was submitted to Akl and Bissett, Bissett discussed the proposed document with the Bank President. They rejected a subordination of its interest and accordingly advised Akl. Nonetheless, a lien search later revealed that the Mortgagee Waiver was executed but the signatures of Akl and Bissett were forged. Michael also signed the Mortgagee Waiver, purportedly as a witness, but he explained that the document was signed in conjunction with other financing documents on his desk. Michael agreed that the lien placed on plaintiffs' property as a result of the Mortgagee Waiver should be discharged. The placement of the lien precluded plaintiffs from seeking refinancing of the loan with the Bank. Additionally, there was no indication that defendants disclosed that the majority of their investment was provided through financing by LCA, and therefore, the Bank was not adequately apprised of the risks involved in the transaction. Bissett testified that there were grounds to "call" the loan to the Akls, but the Bank had not done so because payments were being made.

Although the trial court did not expressly identify the cause of action that plaintiffs proved, the opinion and decision indicated that it found defendants breached the contract and it opted to reform the contract, rather than rescind it, stating in pertinent part:

Despite discussions that may have taken place about using Larson to provide the equipment necessary for the site, the contract the parties signed did not obligate Yatooma to use Larson. The Improvement Agreement only obligated Yatooma to advance funds to purchase and install the equipment and image items set forth on Exhibit A (attached to it) for the amount set forth on Exhibit A. This is clearly set forth in Paragraph 2 of the Improvement Agreement. What the Improvement Agreement did not specify was how Yatooma was to advance those funds. It only obligated Yatooma to advance them.

However, as it turned out, Yatooma did not advance $570,000, the amount it agreed to advance, but advanced just over $378,000, nearly $200,000 less than the amount to which it had agreed. In addition, the First Amendment to the Management Fee Agreement stated that Yatooma "has invested approximately $570,000" in petroleum storage and dispensing equipment on the subject premises. The Court finds it more than coincidental that the First Amendment to the Management Fee Agreement and the Improvement Agreement, which were contemporaneous, both state that amount.

The Management Fee Agreement, the First Amendment to the Management Fee Agreement, and the Improvement Agreement were all parts of the same transaction and should be read together. **Their terms clearly state that Yatooma either had advanced or would advance $570,000, which it did not do**. [Emphasis added.]

Consequently, when it issued the judgment, the trial court did not enter a damage award in favor of plaintiffs but revised the terms of the contract to reflect defendants' reduced investment and make plaintiffs whole, stating in relevant part:

The agreements entered into by and between the parties, including [t]he Improvement Agreement, the Management Agreement and the First Amendment to Management agreement are hereby reformed as follows:

A. The duration of the Management Fee Agreement and the terms of the buyout contained within the First Amendment to the Management Fee Agreement shall be and hereby are reformed, amended, recalculated and reduced proportionately to reflect Defendant Yatooma Oil's actual investment of $378,000 rather than $570,000;

B. Plaintiff Harbor Xpress, LLC is only required to sell 8,621,052.63 gallons of Defendant's [sic] gasoline over a period of 6.6315 years, rather than 13,000,000 gallons of Defendant's gasoline over 10 years.

From this decision, defendants appeal.

## II. STANDARD OF REVIEW

In *Bayberry Group, Inc v Crystal Beach Condo Ass'n*, 334 Mich App 385, 392; 964 846 (2020), this Court delineated the following standards applicable to a bench trial:

"This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo. A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003) (citations omitted). "The construction and interpretation of an unambiguous contract is a question of law that we review de novo." See *Rossow v Brentwood Farms Dev, Inc*, 251 Mich App 652, 658; 651 NW2d 458 (2002). "The extent of a party's rights [. . .] is a question of fact, and a trial court's determination of those facts is reviewed for clear error. A trial court's dispositional ruling on equitable matters, however, is subject to review de novo." *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005).

When an appellant fails to challenge the basis of the ruling by the trial court, we need not even consider granting the party the relief requested. *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004).

## III. ANALYSIS

Defendants allege that the trial court erred in determining that fraudulent inducement was established because it was Akl that provided the cost estimate of $570,000. Because the trial court's ruling was premised on the breach of contract, defendants failed to challenge the basis of the trial court's ruling and are not entitled to appellate relief.

In *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 694; 818 NW2d 410 (2012), this Court addressed the elements of a contract and its construction:

"The essential elements of a contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation." *Mallory v City of Detroit*, 181 Mich App 121, 127; 449 NW2d 115 (1989). Issues regarding the proper interpretation of a contract or the legal effect of a contractual clause are reviewed de novo. *Fodale v Waste Mgt of Mich, Inc*, 271 Mich App 11, 16-17; 718 NW2d 827 (2006). When interpreting a contract, the examining court must ascertain the intent of the parties by evaluating the language of the contract in accordance with its plain and ordinary meaning. *In re Egbert R Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008). If the language of the contract is clear and unambiguous, it must be enforced as written. *Id*. A contract is unambiguous, even if inartfully worded or clumsily arranged, when it fairly admits of but one interpretation. *Holmes v Holmes*, 281 Mich App 575, 594; 760 NW2d 300 (2008). Every word, phrase, and clause in a contract must be given effect and contract interpretation that would render any part of the contract surplusage or nugatory must be avoided. *Woodington v Shookoohi*, 288 Mich App 352, 374; 792 NW2d 63 (2010).

To establish an action for breach of contract, a party must show, by a preponderance of the evidence, that: (1) there was a contract; (2) the other party breached the contract; and (3) there were damages incurred by the party claiming breach. *Bayberry Group, Inc*, 334 Mich App at 393. Rescission is an appropriate remedy in a contract action when there is a material breach affecting

-6-

a substantial or essential part of the contract. *Holtzlander v Brownell*, 182 Mich App 716, 721; 453 NW2d 295 (1990). A breach is material if the nonbreaching party does not obtain the reasonably expected benefit. *Id*. at 722.

"The general theory of reformation is that where there is clear evidence that both parties reached an agreement, but as the result of mutual mistake, or mistake on the one side and fraud on the other, the instrument does not express the true intent of the parties, equity will reform the instrument so as to express what was actually intended." *Ross v Damm*, 271 Mich 474, 48-481; 260 NW 750 (1935). "[C]ourts are required to proceed with the utmost caution in exercising jurisdiction to reform written instruments." *Olsen v Porter*, 213 Mich App 25, 28; 539 NW2d 523 (1995). Furthermore, in its sound discretion, a court may only grant equitable relief where a legal remedy is not available. *Tkachik v Mandeville*, 487 Mich 38, 45; 790 NW2d 260 (2010). A remedy at law precludes a suit in equity when the legal remedy is complete and ample, not doubtful and uncertain. *Id*. A legal remedy at law precludes a suit in equity when the legal relief is as effectual as the remedy that equity may grant under the circumstances. *Id*.

Breach of contract damages are awarded to protect the expectation interest of the promisee. See *Burnside v State Farm Fire & Casualty Co*, 208 Mich App 422, 429; 528 NW2d 749 (1995). The remedy for the breach may be compensatory damages, damages that arise naturally from the breach or those contemplated by the parties at the time the contract was made. *Genesee Co Drain Comm'r v Genesee Co*, 504 Mich 410, 419; 934 NW2d 805 (2019). When the damage remedy seeks to correct against one party's retained benefit at the expense of another party, the technical request is for restitution, not compensatory damages. See *id*. "Restitution restores a party who yielded excessive and unjust benefits to his or her rightful position." *Id*. (citation omitted).

"The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). Expectancy damages or damages designed to make the complaining party whole are generally awarded in common-law breach of contract actions. *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 586 n 4; 624 NW2d 180 (2001). These damages encompass those that naturally arise from the contractual breach or those that the parties contemplated at the time the contract was made. *Id*.

As noted, the essential elements of a contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. *McCoig Materials, LLC*, 295 Mich App at 694. When the parties dispute the interpretation of the contract, the reviewing court must ascertain the parties' intent from an examination of the plain language of the contract. *Id*. This occurs by giving the contract terms their ordinary meaning. *Id*. An unambiguous contract is enforced as written, even if inartfully worded or clumsily arranged, with effect given to every word, phrase, and clause. *Id*.

The "First Amendment to Management Fee Agreement" expressly provided that Yatooma Oil 'has invested approximately $570,000' in petroleum storage and dispensing equipment" in the project with plaintiffs. Additionally, the "Improvement Agreement" plainly stated that Yatooma Oil agreed to "advance funds to purchase and install the equipment and storage image items set forth on Exhibit A attached hereto[.]" A review of Exhibit A reveals that it also calculated the

investment as an estimated "$570,000." The use of the terms "approximately" and "estimated" did not entitle defendants to reduce their contribution from $570,000 to $378,000. The "Improvement Agreement" expressly stated that Yatooma Oil "agrees to advance funds to purchase and install the equipment and image items set forth on Exhibit A attached hereto for amount set forth on Exhibit A[.]"

Thus, although there were references to "approximately" and "estimated," the plain language of the Improvement Agreement stated that defendants would advance funds to purchase and install the equipment as set forth in Exhibit A, and Exhibit A identified the amount as $570,000. The trial court commenced its opinion and decision after trial by noting that four causes of action were raised in the complaint, including breach of contract and fraud in the inducement. Although the trial court did not state which claim was proven by plaintiffs, it is apparent that the trial court found that defendants breached the terms of the written contract. The trial court's ruling, as set forth in pertinent part below, substantiates the content of the contracts highlighted in this opinion:

> Despite discussions that may have taken place about using Larson to provide the equipment necessary for the site, the contract the parties signed did not obligate Yatooma to use Larson. The Improvement Agreement only obligated Yatooma to advance funds to purchase and install the equipment and image items set forth on Exhibit A (attached to it) for the amount set forth on Exhibit A. This is clearly set forth in Paragraph 2 of the Improvement Agreement. What the Improvement Agreement did not specify was how Yatooma was to advance those funds. It only obligated Yatooma to advance them.

> However, as it turned out, Yatooma did not advance $570,000, the amount it agreed to advance, but advanced just over $378,000, nearly $200,000 less than the amount to which it had agreed. In addition, the First Amendment to the Management Fee Agreement stated that Yatooma "has invested approximately $570,000" in petroleum storage and dispensing equipment on the subject premises. The Court finds it more than coincidental that the First Amendment to the Management Fee Agreement and the Improvement Agreement, which were contemporaneous, both state that amount.

> The Management Fee Agreement, the First Amendment to the Management Fee Agreement, and the Improvement Agreement were all parts of the same transaction and should be read together. **Their terms clearly state that Yatooma either had advanced or would advance $570,000, which it did not do**.

Although the trial court summarized the witnesses' testimony at trial, including Akl's testimony about Michael's representations regarding the investment amount, it is apparent from the trial court's ruling that it examined the contract documents signed by the parties and determined that the plain language of those contracts revealed a commitment by defendants to expend $570,000 on the project. And, because defendants did not expend that amount, it determined that reformation, as opposed to rescission, was the appropriate remedy because rescission of the contract between the parties would not relieve the Akls of their obligations with Tri-County Bank.

But the trial court erred in classifying or identifying its remedy for breach of contract as reformation. Reformation is an equitable remedy, and an equitable remedy is not available when a remedy at law exists. *Tkachik*, 487 Mich at 45; *Ross*, 271 Mich at 480-481. Nevertheless, a remedy for breach of contract may be compensatory damages, those that naturally arise from the breach and that are technically known as restitution. *Genesee Co Drain Comm'r*, 504 Mich at 419. Restitution is a damage remedy designed to correct one party's retention of a benefit at the expense of another, and restitution serves to restore a party who yielded unjust benefits to the rightful position. *Id*.

In the present case, the trial court determined that defendants agreed to provide $570,000 in funding in the contract documents. Despite that provision, defendants only expended $378,000. Rather than award plaintiffs the difference between the amount promised and the amount expended, the trial court reduced the gallons of gas that plaintiffs must sell and the duration of the contractual period. Because the equitable remedy of reformation may be characterized as a legal remedy of compensatory damages, the trial court did not err in its decision. And, in any event, defendants failed to challenge the basis of the trial court's ruling, the breach of contract. The claim of error raised by defendants does not entitle them to appellate relief.

Despite the trial court's conclusion that defendants did not satisfy the contractual terms, defendants submit that the trial court improperly found fraudulent inducement. Although fraudulent inducement was not the basis of the trial court's ruling, see *Derderian*, 263 Mich App at 381, we conclude that this challenge fails.

To establish fraud in the inducement, a plaintiff must demonstrate that: (1) the defendant made a material representation; (2) it was false; (3) the defendant knew the representation was false when made or made it recklessly without knowledge of its truth and as a positive assertion; (4) the defendant's representation was made with the intention that the plaintiff act upon it; (5) the plaintiff's actions relied upon the representation; and (6) the plaintiff suffered damages. *Custom Data Solutions, Inc v Preferred Capital, Inc*, 274 Mich App 239, 243; 733 NW2d 102 (2006) (citation omitted). In Michigan, fraud is not presumed but must be established by clear and convincing evidence. *Deschane v Klug*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 360677), slip op at 6. Fraud cannot be perpetrated on a party who has full knowledge that a representation is to the contrary. *Titan Ins Co v Hyten*, 491 Mich 547, 555 n 4; 817 NW2d 562 (2012).

Defendants contend that the trial court erred in finding fraud in the inducement because Michael did not make a false representation, and the $570,000 was proffered by Akl. However, there was an e-mail exchange between plaintiffs' attorney, Mark Davidson, and defendants' attorney, Clifford A. Knaggs, about Exhibit A. In the e-mail, Davidson questioned the $120,000 in charges for equipment, claiming that the Akls understood those items were customarily provided free of charge. In response, Knaggs rejected the contention that the equipment was free and stated that the "entire $570,000.00 investment amount is subject to amortization and payback." Davidson also noted that the Akls objected to any waiver of rights if foreclosure proceedings were commenced. However, Knaggs responded that the provision must remain because "Yatooma is a lender of over a half million dollars and must retain the full range of remedies."

Moreover, there was an e-mail exchange between Akl and Michael on July 2, 2019. Akl initially wrote to Michael on July 1, 2019, with questions about pricing and supply in light of discussions with plaintiffs' attorney and other industry people. On July 2, 2019, Michael wrote back that defendants were unwilling to make any changes to the current agreement. He stated that the gas would not be sold below cost to match the competition, they could not monopolize prices, and there would be a payment to plaintiffs if fuel failed to be delivered to them under certain circumstances. Michael seemingly explained that defendants would not agree to any changes to the agreement because "[w]e are spending $550,000 in your location[.]"[2]

We reject defendants' contention that fraud was not established by clear and convincing evidence. The contractual agreements as well as the correspondence between the parties and their attorneys demonstrated that defendants represented, at various times, that they were investing between $500,000 and $570,000. Akl testified that initially the contractual agreement only required a sale of 12,000,000 gallons to payback defendants' investment. However, she noted that the amount was increased to 13,000,000 gallons to reflect defendants' increasing investment. Additionally, Akl testified that she guaranteed Tri-County Bank's first lien position and refused to sign a Mortgagee Waiver. Nonetheless, the Mortgagee Waiver was purportedly signed by Akl and Bissett, but they denied signing the documents and noted misspellings in their name or corporate identification. The evidence presented did not establish that only the Akls proffered and relied on the investment amount of $570,000. Defendant's claim of error is not supported by the evidence.[3]

Affirmed.


/s/ Anica Letica
/s/ Christopher M. Murray
/s/ Sima G. Patel

---

[2] The consideration of this parol evidence was not precluded because it did not vary the terms of a written agreement or demonstrate that an agreement was not integrated. See *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 503-504; 579 NW2d 411 (1998).

[3] Defendants also raised the issue of involuntary dismissal. Although the position was announced in the statement of questions presented, defendants failed to raise the issue in the text of their appellate brief, and they failed to address the merits of the issue and cite appropriate authority in support. See *Woods v SLB Prop Mgmt, LLC*, 277 Mich App 622, 626-627; 750 NW2d 228 (2008). Therefore, the issue was abandoned. *Id*.